**UNITED STATES of America,**
**Appellee,**

v.

**Anthony Joseph ZAMBITO, Appellant.**

**No. 8711.**

United States Court of Appeals
Fourth Circuit.

Argued Jan. 7, 1963.

Decided March 5, 1963.

Certiorari Denied May 20, 1963.
See 83 S.Ct. 1524.

Gilbert S. Bachmann and D. Paul Camilletti, Wheeling, W. Va. (James A. Byrum, on the brief), for appellant.

Robert E. Maxwell, U. S. Atty. (John H. Kamlowsky, Asst. U. S. Atty., and John P. Diuguid, Attorney, Department of Justice, on the brief), for appellee.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BRYAN, Circuit Judges.

SOBELOFF, Chief Judge.

Together with five confederates, Anthony J. Zambito was indicted in the United States District Court for the Northern District of West Virginia for conspiracy and substantive violations of the newly-enacted interstate racketeering statutes.[1] Five counts charged him,

---

1. "Sec. 1952. Interstate and foreign travel or transportation in aid of racketeering enterprises

 "(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

 "(1) distribute the proceeds of any unlawful activity; or

 "(2) commit any crime of violence to further any unlawful activity; or

 "(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

 and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be

in essence, as a principal and accessory (18 U.S.C.A. § 2), with causing others to travel and to carry in interstate commerce gambling paraphernalia to be used in, and with intent to promote, an illegal numbers operation. A sixth count accused him of willfully misrepresenting a material fact on his wagering tax return in violation of 18 U.S.C.A. § 1001. A jury convicted him on all six counts and he was sentenced to a total of four years imprisonment.

As Zambito's major contention on this appeal is a challenge to the sufficiency of the evidence, a brief review of the pertinent facts is necessary. These are not in dispute.

Early in September, 1961, John Snyder and Joseph Fox decided to dispose of the illicit numbers business which for more than twenty years they had operated from headquarters in Martins Ferry, Ohio, covering the northern panhandle of West Virginia as well as parts of eastern Ohio. The recent passage of more stringent anti-gambling laws by the State of Ohio and the enactment of the above-mentioned federal statutes prompted their decision to pull up stakes. However, they wished to arrange for a successor in the enterprise. Their quest for one led them across the Ohio River to West Virginia, where they sought out Zambito, owner and proprietor of the Jolly Bar in Wheeling. After some initial hesitation, Zambito took over the business and, on September 18, 1961, Snyder and Fox delivered to him an adding machine, numbers books, scrap pads, and other sundry tools of the trade. What consideration, if any, moved from the two Ohio men is not disclosed in the record.

For three months Zambito functioned as "banker" and controller of the operation, and daily he received the bets and numbers slips of customers solicited by "writers" or "runners" who worked for or with him on a percentage basis. Four of these had formerly written numbers for Snyder and Fox, and they now turned over their bets to Zambito and paid off winning customers with proceeds drawn from his Jolly Bar "bank." Two of these runners, co-defendants Arthur C. Hale and James Rogerson, resided in Ohio. On a daily schedule, they continued to accept numbers wagers from Ohio customers, crossed the Ohio River and banked the numbers slips and proceeds with Zambito in Wheeling. This pattern of operations lasted until De-

---

fined not more than $10,000 or imprisoned for not more than five years, or both.

"(b) As used in this section 'unlawful activity' means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion or bribery in violation of the laws of the State in which committed or of the United States.

"(c) Investigations of violations under this section involving liquor or narcotics shall be conducted under the supervision of the Secretary of the Treasury."

"Sec. 1953. Interstate transportation of wagering paraphernalia

"(a) Whoever, except a common carrier in the usual course of its business, knowingly carries or sends in interstate or foreign commerce any record, paraphernalia, ticket, certificate, bills, slip, token, paper, writing, or other device used, or to be used, or adapted, devised, or designed for use in (a) bookmaking; or (b) wagering pools with respect to a sporting event; or (c) in a numbers, policy, bolita, or similar game shall be fined not more than $10,000 or imprisoned for not more than five years or both.

"(b) The section shall not apply to (1) parimutuel betting equipment, parimutuel tickets where legally acquired, or parimutuel materials used or designed for use at racetracks or other sporting events in connection with which betting is legal under applicable State law, or (2) the transportation of betting materials to be used in the placing of bets or wagers on a sporting event into a State in which such betting is legal under the statutes of that State, or (3) the carriage or transportation in interstate or foreign commerce of any newspaper or similar publication.

"(c) Nothing contained in this section shall create immunity from criminal prosecution under any laws of any State, Commonwealth of Puerto Rico, territory, possession, or the District of Columbia."

268

cember 13, 1961, when government agents raided the Jolly Bar, arrested Zambito and his associates, conducted a search of the premises, and confiscated money and gambling paraphernalia.[2] By Zambito's estimate, his gross receipts over the three-months period amounted to $9,000.

 There is no denial that Zambito was engaged in gambling in violation of the West Virginia law. His argument is that the Government failed to show that he was aware of the Ohio source of the bets brought to him by Hale and Rogerson. Hale testified that Zambito had no knowledge that his numbers writing activities were conducted in Ohio. The Government, which had maintained a constant surveillance, concedes that Zambito was not observed in Ohio. There is no direct evidence that he knew that Hale and Rogerson were soliciting bets outside West Virginia, but the Government insists that a sound inference of such knowledge may be drawn from a "development and collocation of circumstances." Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Williams v. United States, 271 F.2d 703, 706 (4th Cir., 1959); Blumenfield v. United States, 284 F.2d 46, 53 (8th Cir. 1960).

There can be no doubt that the regular course of interstate activity, pursued continuously over a span of twenty years, was not substantially altered when Zambito gained control of the enterprise. The only noteworthy change after mid-September was in the name and location of the owner-banker. Zambito knew that the writers under the Snyder-Fox regime had regularly done business in both states. He was equally aware that severe penalties would attach to a continuation of such activity in Ohio, yet he exercised no supervision and made no inquiries during his constant association with his writers to assure himself that their established source of revenue in that state had been abandoned when he took over.

Is this to be construed as innocent naivete or calculated indifference on his part? Is it too speculative for a jury to draw the latter inference? We think not. The uninterrupted pattern of interstate activity and its perpetuation by writers with whom Zambito was in daily contact for three months were circumstances which fairly justify, if they do not compel, an inference of a common purpose to solicit and accept bets from any source without geographical limitation. See United States v. Crimmins, 123 F.2d 271, 273 (2d Cir., 1941); cf., Abbate v. United States, 247 F.2d 410, 413 (5th Cir., 1957), aff'd, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959). When a person engaged in an illegal business persistently disregards plain facts which are readily available to him, and there is an evident motive to ignore those facts, the law does not forbid a jury to reach the conclusion which rational men would reach in the circumstances. See United States v. Starkey, 52 F.Supp. 1, 3 (E.D.Ill.1943); United States v. Segelman, 86 F.Supp. 114, 121 (W.D.Pa.1949). Cf., Pereira v. United States, 347 U.S. 1, 12, 74 S.Ct. 358, 98 L.Ed. 435 (1954); Corey v. United States, 305 F.2d 232, 237 (9th Cir., 1962); Pilgrim v. United States, 266 F.2d 486, 488 (5th Cir., 1959); Brubaker v. United States, 183 F.2d 894, 898 (6th Cir., 1950).

Equally baseless is Zambito's contention that he was improperly convicted for making a false statement in his wagering tax return, wherein he answered "none" as to the number of persons accepting wagers on his behalf. The falsity of this statement is not controverted, but only its materiality.

While 18 U.S.C.A. § 1001 proscribes only those falsifications which pertain to material facts, Paritem Singh Poonian v. United States, 294 F.2d 74, 75 (9th Cir., 1961); Gonzales v. United States, 286 F.2d 118, 120 (10th Cir., 1960); Freidus v. United States, 96 U.S.App.D.C. 133, 223 F.2d 598, 601 (1955), Zambito's

2. No question is raised as to the legality of the arrest or search.

statement manifestly falls within that category. Registration is as much a condition precedent to engaging in the business of accepting wagers as payment of the special occupational tax, United States v. Kahriger, 345 U.S. 22, 73 S.Ct. 510, 97 L.Ed. 754 (1953), and one so engaged is commanded by Congress to furnish "the name and place of residence of each person who is engaged in receiving wagers for him or on his behalf." 26 U.S.C.A. § 4412(a) (2). By compelling the principal to disclose allied personnel such as writers, who may be likewise subject to the occupational tax, 26 U.S.C.A. § 4411, this provision assures the collection of revenue where the cloak of anonymity might otherwise enhance the possibility of tax evasion. Fraudulent concealment of names and addresses not only tends to obstruct the administration of a valid tax measure, cf., Ogden v. United States, 303 F.2d 724 (9th Cir., 1962); United States v. Stark, 131 F. Supp. 190 (D.Md.1955), but here it also disguised the Ohio source of Zambito's own income which the disclosure of names and addresses might have revealed. See United States v. Shaffer, 291 F.2d 689, 692 (7th Cir., 1961).

Zambito further complains of a typographical error in the indictment which stated October 23, 1962, rather than 1961, as the date of his false statement. This obvious clerical mistake was in no way prejudicial. As the 1962 date had not yet arrived, and as he was not in the business before 1961, the intent of the indictment could not have misled anyone. Rule 52(a), F.R.Cr.P.; Lucas v. United States, 88 U.S.App.D.C. 160, 188 F.2d 627, 628 (1951); Lund v. United States, 19 F.2d 46, 47 (8th Cir., 1927). Cf., Stillman v. United States, 177 F.2d 607, 611 (9th Cir., 1949).

Nor is there any conceivable merit in the final argument that the District Court erred when midway through the trial it dismissed a juror who belatedly admitted in chambers that he had not truthfully responded to the Judge's inquiry on voir dire as to whether a federal gambling stamp had been issued to him or to a member of his family. The court's action was clearly warranted by the circumstances, particularly in the absence of any showing or even a claim of prejudice. Rule 24(c), F.R.Cr.P.; Gillars v. United States, 87 U.S.App.D.C. 16, 182 F.2d 962, 980 (1950); United States v. Goldberg, 206 F.Supp. 394 (E.D.Pa.1962). The impartiality of the jury which tried the defendant is conceded; he did not suffer by the exclusion of a juror whom he may or may not have thought biased in his favor.[3] Puff v. United States, 211 F.2d 171, 184–185 (2nd Cir., 1954).

Affirmed.

---

3. The dismissed juror was replaced by the first alternate chosen at the beginning of the trial.