No. 84-540

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

BERNARD PEASE, JR.,

Defendant and Appellant.

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Gary E. Wilcox argued, Billings, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Patricia J. Schaeffer argued, Asst. Atty. General
Harold F. Hanser, County Attorney, Billings, Montana
Charles A. Bradley, Deputy County Atty., Billings

Submitted: May 31, 1986

Decided: August 8, 1986

Filed:

AUG 8 - 1986

Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

The defendant, Bernard Pease, Jr., appeals from the judgment and jury verdict finding him guilty of deliberate homicide and the denial of his motion for a new trial in the Yellowstone County District Court. He raises five issues on appeal: (1) Whether admitting a prior inconsistent statement of one person through the testimony of a second person was error; (2) whether probable cause existed to issue a search warrant for the residence and vehicles of the defendant and his family; (3) whether certain items of evidence and testimony were inadmissible character evidence; (4) whether the District Court erroneously replaced a juror during trial who had admitted to and would be charged with a felony; and (5) whether the State's closing argument violated the defendant's rights to due process and a fair trial. We affirm the jury verdict and judgment thereon and the denial of defendant's motion for a new trial.

At 7:30 a.m. on Thursday, December 1, 1983, Jeffrey Miller discovered the victim's body on his way to work. It was lying in the snow near two garbage dumpsters in an alley between North 12th and North 13th Streets in Billings, Montana. Mr. Miller asked his employer to call the police and officers and detectives arrived within ten minutes.

The young Indian woman's body was nude, frozen and almost completely exsanguinated. The officers found very little blood at the scene. The victim had been stabbed repeatedly in the chest and her throat was cut. The slipped skin on her ankles and drag marks in the snow suggested the body had been dragged by the legs to the location near the

dumpsters. There were footprints near the body and many tire tracks in the alley. There was a strand of orange yarn in the victim's hair. Frozen ridges on her abdomen, which appeared to be from some kind of wrinkled material, disappeared as the body thawed. Her left foot appeared to be further decomposed than the rest of the body. The detectives later made a plaster cast of the decomposed foot to preserve the pattern of ridges and dents on the foot. According to the pathologist, Dr. Mueller, the victim had been dead from five to ten days when she was found, with the middle time most probable. This suggested a time of death in the early morning of November 24, 1983. During an autopsy, Dr. Mueller collected blood samples, head and pubic hairs, and fingernail scrapings from the victim.

The police identified the victim as Marie LaFromboise/Philbrick, a 23 year old woman who sometimes worked as a prostitute in Billings. She lived with two roommates, John Salas and Brenda Cunningham. Both last saw her Thanksgiving morning, November 24, 1983. Salas saw her walking in downtown Billings around 3:00 a.m. and Cunningham saw her about 3:30 a.m. talking to a man in a yellow pickup. The defendant drove a yellow and white pickup.

On one side of the alley where the body was found was a large quonset hut style building. The defendant worked at the Fireplace Store, owned and operated by the Pease family, which was in that building. An elderly man named Jim Andrews lived in a house trailer near the Pease business, about 50 yards from the dumpsters. About 3:30 or 4:00 a.m., the morning the body was found, his dog began barking. As he opened his door to let the dog out, he heard the lids

3

clanging over the dumpsters. When he shouted in the direction of the dumpsters, the clanging stopped.

On January 5, 1984, the owner of an automotive electrical shop, located about two blocks away from the Pease business, found a sleeping bag and some jute carpet backing behind a fence alongside his building. He saw that the sleeping bag had "a lot of blood on it" so he called the police. When the officers arrived, they collected the sleeping bag and carpet backing and found orange carpet fibers similar to those in the victim's hair. They also found bottles, pieces of brick, and a plum bob and observed holes in the sleeping bag.

Later that afternoon, the officers went to the nearby Pease masonry business seeking information about the pieces of brick. They found similar brick in the office and in the outside yard. The next day, they returned and received signed permission from Bernard Pease, Sr., the defendant's father, to search the premises for evidence in the homicide.

The search soon revealed orange shag carpet similar to the strands found in the victim's hair and a large piece of jute carpet backing with a section cut out. This piece matched that found with the bloody sleeping bag in fiber, weave, size and type of cut. When the officers searched the wash bay area in the rear of the Pease business, they found white cardboard boxes with blood on them, blood on the floor, a bloody paper napkin stuck to part of a box, hair, a pornographic magazine depicting violence toward women, more orange carpet strands, a large piece of orange carpet, and used and unused condoms. The defendant was one of only four people who had access to this part of the building; the

4

others were his parents and an uncle.  Along one wall near the floor in the wash bay area there were several heat pipes which had the dust rubbed off in small areas.  The cleaned areas matched the bumps and lines in the victim's left foot.  According to the pathologist, hot, dry heat could have caused the foot to dehydrate and decompose faster than the rest of the body.

When the police captain realized the wash bay was the crime site, he decided to take statements from the Pease family.  The defendant walked out so the captain followed him and asked him to come back.

On the basis of the evidence found during this search, the officers obtained search warrants for the Pease residence in Billings, for a trailer they owned in Fort Smith, Montana, and for another search of the business.  In the defendant's room at the residence the police found used and unused condoms like those found at the scene of the homicide, pornographic magazines featuring female bondage and women's panties saturated with multiple semen deposits.  The yellow pickup belonging to the Pease business and generally driven by defendant had in it a flowered yellow sheet stained with what appeared to be blood.  In the car registered to the defendant, the police found a payroll stub made out to defendant dated the night the victim disappeared and a condom like those found in his room and at the scene of the homicide.

The defendant was arrested February 1, 1984, and charged with deliberate homicide on February 9, 1984.  The trial began on July 16, 1984.  During trial, an expert on blood and body fluids testified that the blood on the jute

5

carpet backing, the sleeping bag, the Kleenex and cardboard boxes from the wash bay, the sheet from defendant's pickup, the wash bay floor and a condom found at the wash bay was the same type as that of the victim. He also stated that no more than 84 to 120 people in the Billings area, with a population of about 120,000, would have this type of blood. This expert further testified that the semen from the women's panties found in defendant's bedroom, and from the used condoms found in the wash bay, including the one with blood on it, matched that of defendant.

The director of the State Crime Lab testified about the comparison of human hair made in this case. He explained that defendant's hair had a unique pigmentation not present in the hair of other people connected with the case and an uncommon medulla. He identified head and pubic hair found in the wash bay area, on the bloody sheet in the yellow pickup, by the dumpster where the victim's body was found, in a mat of blood on the victim's hand, and under one of her fingernails, as matching the characteristics of defendant's hair. According to this expert, hair characteristic of the victim's hair was found in the wash bay, on the sleeping bag, on the sheet in the defendant's pickup and on a condom from the defendant's house. This same expert testified that the orange carpet fiber in the victim's hair was very similar to that found at the Pease business.

The defendant's hair expert concluded many of these hairs were not matched. However, he admitted most of his slides showing the hair were made at a magnification too low to show variations in pigment. Others were so high that the

full hair was not in focus, had too much light which lessened the detail shown, or were out of focus.

The defendant's ex-wife identified the sleeping bag as the "trundle bundle" which was a wedding gift to herself and defendant. She testified that he kept it when they were divorced and that they had used it frequently during their marriage. On January 6, 1984, when the defendant was asked to identify the trundle bundle in a photograph, he claimed not to recognize it.

The defense relied on supposed sightings of the victim after November 24, 1983, and defendant's alibi for the suspected time of the killing. These alleged sightings were brief contacts with individuals who were strangers to the victim and most were from a distance. Her roommates, who saw her on a daily basis before her death, did not see her after the early morning on November 24, 1983.

Although the defense also relied on alibi, the defendant's whereabouts were unaccounted for during the late night and early morning hours of November 23 and 24, 1983. Defendant's bowling teammate testified that defendant bowled with the team on November 23, 1983, that bowling finished about midnight, and that he, the teammate, went home about 2:00 a.m. Defendant's father testified that defendant went out the night of the 23rd and he did not see defendant again until after 9:00 a.m. on Thanksgiving morning, although he saw defendant's truck at home about 6:00 a.m. that day. Friends and family did not begin to arrive for Thanksgiving dinner until after 11:00 a.m., on the 24th. Defendant was home at that time.

7

The jury found defendant guilty of deliberate homicide on August 1, 1984. After the verdict, defendant requested a new trial. The District Court denied this motion and sentenced defendant to 100 years on September 21, 1984. He was designated a dangerous offender and received an additional 10 years for use of the weapon involved in the homicide.

Defendant appeals the judgment entered against him raising five issues:

1) Whether admitting the prior inconsistent statement of one person through the testimony of another was error.

2) Whether probable cause existed for a search warrant issued on January 24, 1984, for the residence and vehicles of Pease and his family.

3) Whether certain items of evidence seized during searches of the Pease business and testimony about defendant's alleged involvement with prostitutes was inadmissible character evidence.

4) Whether the District Court erred when, during trial, it replaced a juror after finding out the juror was about to be arrested for sexual intercourse without consent.

5) Whether the prosecutor's closing argument denied Pease his rights to a fair trial and due process.

In the first issue the defendant contends the District Court erred in admitting the testimony of Lou Sullivan concerning extrajudicial statements made by Brian Emineth. Emineth testified first stating that he was at Lou Sullivan's house when he heard a television report on this homicide investigation. He denied saying anything about being with Pease and picking up, raping and murdering the victim. He

admitted knowing Pease for about 17 years and having been at the business a few times. He first said he had never been in the wash bay area but later said he had been there once. On cross-examination he admitted that he thought he would be arrested for the deliberate homicide.

Lou Sullivan testified after Emineth. She said Emineth told her that the police were looking for him and Pease in connection with the homicide, that the two of them had picked up the victim and taken her to the Pease business, that Pease stabbed the victim, and that Emineth had tried to stop him but could not and fled the scene. She admitted that she was drinking when Emineth made the statements and that Emineth was drunk at the time. She also said he told her the body was at Alkali Creek and the news reports were false.

Hair characteristic of Emineth's was found at the murder scene, on victim's body, and in Pease's pickup. He stated that the State Lab was lying about the hair at the scene and that the hair had been "planted". He denied being at the murder scene or in Pease's pickup.

The defendant offers two rationales supporting his assertion that to admit Sullivan's testimony was error. The first is that the statements were not admissible under any of the Montana Rules of Evidence and the second is that their admission denied him his right to confrontation of witnesses.

Under the first rationale, the defendant argues that the State knew Emineth would deny making the statements when it called him to testify and deliberately "set up" the impeachment. The State justifies admitting Sullivan's testimony as impeachment of Emineth through showing his prior inconsistent statements under the Montana Rules of Evidence.

9

According to these rules, a party can impeach his own witness by showing prior inconsistent statements without regard to the former requirement of surprise. State v. Fitzpatrick (1980), 186 Mont. 187, 197, 606 P.2d 1343, 1349, cert. den., 449 U.S. 891, citing Montana's Code Commission Comment to Rule 607, M.R.Evid. Rule 613, M.R.Evid. requires that the witness to be impeached be given an opportunity to explain or deny the statements prior to the admission of extrinsic evidence showing the inconsistent statements. Emineth had this opportunity and denied making the statements. Contrary to the defendant's suggestion, the State most certainly would have preferred Emineth admit to having seen the defendant murder the victim rather than deny making the statements.

Sullivan's testimony was admitted next, with Emineth's denial laying the foundation for the introduction of his prior inconsistent statements. The defendant argues that her testimony was so inherently unreliable that it should have been inadmissible as hearsay. Rule 801(d)(1), M.R.Evid., provides in pertinent part:

> A statement is not hearsay if: (1) The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony . . .

The federal rule from which this was derived requires that the prior inconsistent statement be one "given under oath subject to the penalty of perjury at a trial or hearing, or other proceeding, or in a deposition." Rule 801(d), Federal Rules of Evidence. The Montana rule deleted this oath requirement as harmful and unnecessary. Emineth was present at trial and subject to direct and cross-examination. The jury could observe his demeanor as he testified. They could

10

discern the truth or falsity of the prior statement as well as the truth or falsity of the inconsistent testimony. See Advisory Committee Comments to proposed federal rules, 56 F.R.D. 183, 296. Applying Rule 801(d)(1)(A), M.R.Evid., Sullivan's testimony was properly admitted as the reliability of both her and the declarant could be evaluated by the jury.

This Court considered and rejected a defendant's argument made under similar circumstances in Fitzpatrick, 186 Mont. 187, 606 P.2d 1343. In that case, the declarant testified and denied making statements about the defendant's actions while committing the crime. Another witness then testified about the declarant's inconsistent out-of-court statement. This Court held the evidence was admissible, relying on Rules 801(d)(1)(A) and 801(d)(2)(E), M.R.Evid. The argument that the State intentionally called the declarant knowing it would impeach him without having been surprised was considered irrelevant under Montana's evidentiary rules. Here, as in Fitzpatrick, the State's intention was irrelevant and the prior inconsistent statements were properly admissible under the rules of evidence and could be considered as substantive evidence by the jury.

The defendant's second rationale to support his argument in this issue is that admitting this testimony denied him his right to confront witnesses as guaranteed by the Sixth Amendment to the U.S. Constitution. This Court considered and rejected this argument in Fitzpatrick, 186 Mont. 187, 606 P.2d 1343, relying on two United States Supreme Court decisions, California v. Green (1970), 399 U.S.

11

149, 90 S.Ct. 1930, 26 L.Ed.2d 489, and Nelson v. O'Neill (1971), 402 U.S. 622, 92 S.Ct. 1723, 29 L.Ed.2d 222.

The purpose of the confrontation clause was to prevent depositions or expert affidavits from being used against a defendant instead of placing the witness before the jury and subjecting him to direct and cross-examination. Green, 399 U.S. at 157, 90 S.Ct. at 1934-35, 26 L.Ed.2d at 496-97. In Green, the Supreme Court held that the confrontation clause is not violated by admitting a declarant's out-of-court statements if the declarant is testifying as a witness and subject to full and effective cross-examination. The declarant in Green professed uncertainty or loss of memory at trial about certain facts, so previous statements at a preliminary hearing and to a police officer were admitted into evidence.

The declarant in O'Neill, 402 U.S. 622, 92 S.Ct. 1723, 29 L.Ed.2d 222, denied making the out-of-court statement implicating the defendant and then testified in defendant's favor. The Supreme Court held that the confrontation clause is not violated when the declarant denies making an unfavorable out-of-court statement and then testifies favorably for the defendant.

Here, as in Fitzpatrick, 186 Mont. 187, 606 P.2d 1343, the declarant was called as a witness for the State and denied making an out-of-court statement unfavorable to the defendant. The declarant was subject to cross-examination. The testimony here was favorable to defendant in that he would have been in a worse position had Emineth affirmed making the prior statements. Both Emineth and Sullivan were examined and cross-examined. The defendant was able to show

both were intoxicated at the time of the out-of-court statements. The jury heard that Sullivan had a possible motive of retaliation resulting from another incident. The jury observed the demeanor of both of them. Defendant's right to confront witnesses was not violated by the admission of Sullivan's testimony because the declarant testified as a witness and was subject to a full and effective cross-examination. We hold that the District Court properly admitted the questioned testimony.

In the second issue the defendant contends that the applications for the search warrants of the Pease residence and vehicles do not state facts sufficient to show probable cause. He argues that the applications do not establish a nexus between the items sought and the places to be searched and that the information in the applications was stale. In denying the defendant's motion to suppress, the District Court concluded that the applications set forth sufficient detail to show a homicide had been committed and a reasonable probability that evidence relating to the offense would be at the places described. On the question of staleness, the District Court concluded that due to the nature of the items sought, the passage of time between the discovery of the body and the applications did not cause the information to become stale.

This Court applies the standard for reviewing a determination of probable cause set out in Illinois v. Gates (1983), 462 U.S. 213, 238-39, 103 S.Ct 2317, 2332, 76 L.Ed.2d. 527, 548:

> [W]e affirm the totality of the circumstances analysis that has traditionally informed probable cause determinations. [Citations omitted.]

13

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of the reviewing court is simply to ensure that the magistrate has a "substantial basis for . . . concluding" that probable cause existed.

See, State v. O'Neill (Mont. 1984), 679 P.2d 760, 41 St.Rep. 420, and State v. Pierre (Mont. 1984), 678 P.2d 650, 41 St.Rep. 445. A magistrate's determination should be given great deference by a reviewing court, drawing every reasonable inference possible to support the determination. O'Neill, 679 P.2d at 765, 41 St.Rep. at 425.

The facts and circumstances contained within the four corners of the affidavit supporting the application for a search warrant should justify a reasonable belief that an offense has been committed and that the items sought are at the place designated in the warrant. State v. Isom (1982), 196 Mont. 330, 641 P.2d 417. A search will be upheld where "the nexus between the items to be seized and the place to be searched rested not on direct observation . . . but on the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property." United States v. Spearman (9th Cir. 1976), 532 F.2d 132, quoted in Pierre, 678 P.2d at 653, 41 St.Rep. at 449.

The victim's death was an obvious homicide so there was no doubt an offense had been committed. When the application for a warrant was made, the investigation already had

revealed evidence connecting the homicide to the Pease business. The body was found near the business. The sleeping bag and jute carpet backing were found nearby. The carpet in the victim's hair and the backing found by the sleeping bag were similar to carpet and backing found at the business. Hair and blood matching that of the victim were found in the locked wash bay area of the business. The plaster cast of the victim's foot matched the cleaned water pipes in the wash bay. No one had access to the premises except the defendant, his parents and one uncle during the time the building had been closed and the homicide had occurred. Other evidence in the application also supported the conclusion that the homicide occurred in the wash bay.

The items sought here included the murder weapon (a knife), the victim's missing clothing, jewelry and shoes, a cancelled check payable to the victim or the Empire Bar, condoms like those at the murder scene, bloody rags or tissues, fingerprints, hair and fiber samples, bricks matching those found with the sleeping bag, and tires matching the prints near the body. This was the kind of evidence likely to exist but as yet undiscovered. Some items, i.e., the knife, the clothing, jewelry and shoes of the victim could have been possible mementos and were the kind likely to be found where the persons involved with the crime lived. See, e.g., United States v. Bowers (9th Cir. 1976), 534 F.2d 186, 190-92, cert. den. 429 U.S. 942. Other items, such as the hair, blood samples and fingerprints, would be difficult to collect or dispose of completely. Finally, a number of items, by themselves, were innocuous and likely to be present in a vehicle or residence for a more

15

lengthy period of time after the crime. The information offered to support the application for a search warrant established a nexus between the locations to be searched and the items sought.

The defendant also contends that, in addition to it being unlikely the items were at the places to be searched, it was not probable that the items would still be present in the residence or vehicles 53 days after the discovery of the body. As the District Court noted, "staleness depends largely on the nature of the property sought" and the passage of this amount of time, alone, may not negate probable cause.

> The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch the clock: the character of the crime (chance encounter in the night or regenerating conspiracy?), of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?), etc. The observation of a half-smoked marijuana cigarette in an ashtray at a cocktail party may well be stale the day after the cleaning lady has been in; the observation of the burial of a corpse in a cellar may well not be stale three decades later. The hare and the tortoise do not disappear at the same rate of speed.

Andresen v. State (Md.App. 1975), 331 A.2d 78, aff'd sub. nom. Andresen v. Maryland (1976), 427 U.S. 463, cited in Pierre, 678 P.2d at 654, 41 St.Rep. at 449.

The items sought here were more likely to remain in a residence or vehicle than consumable or perishable goods. Some would have continuing utility to the owner. The places searched were those a person normally would store items. Many of the objects were not of the nature that they would be destroyed by the defendant. Although many items were the

16

kind of evidence that could be moved easily, there was no reason to believe that any would be moved to different locations. Thus, information supporting the applications was not stale. Drawing all reasonable inferences to support the magistrate's determination, we hold that there was a substantial basis for concluding probable cause existed at the time the search warrants were issued.

In the third issue the defendant claims that the District Court improperly admitted into evidence pornographic books, condoms, the woman's panties found in defendant's room, and testimony about his prior contacts with prostitutes. He contends that the evidence was irrelevant, the danger of unfair prejudice substantially outweighed any probative value, and that the testimony was inadmissible character evidence. We first note that photographs of the covers of the pornographic magazines and a pin-up found at the murder scene and in defendant's room, photographs of condoms found at the murder scene and in defendant's room, and a photograph showing stains on the woman's panties found in defendant's room were admitted into evidence, not the objects themselves. We address the admissibility of these photographs separately from the admissibility of testimony about defendant's contacts with prostitutes.

The State contends that the photographs were relevant to show the identity and possible motive of the perpetrator of the crime. Rule 401, M.R.Evid., defines relevant evidence as:

> . . . evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Relevant evidence may include evidence

> bearing upon the credibility of a witness
> or hearsay declarant.

This standard "is meant to allow wide admissibility of circumstantial evidence limited only by Rule 403 or other special relevancy rules in Art. IV [of M.R.Evid.]." Fitzpatrick, 186 Mont. at 207, 606 P.2d at 1354, citing Montana's Code Commission Comment.

The photographs of the condoms, the pornographic magazines and pin-up, and the woman's panties tend to connect the defendant with the scene of the murder and suggest a possible violent sexual motive. A pornographic pin-up suggesting violence and condoms were found at the scene. The search of defendant's room yielded pornographic magazines suggesting violence toward women, condoms like those in the wash bay, and the semen stained woman's panties. The victim's clothing was never found. Although the panties were never identified as belonging to the victim, a detective testified that murderers often take and keep items belonging to the victim. On one of the used condoms in defendant's room, pubic hair matching that of the victim was found. The semen stains and hair on the panties were defendant's type. The hair and fiber expert testified hair adheres to fabric and can be transferred. The jury could have inferred from this evidence that the hair found on the condom came from the panties. These items all tended to link the defendant with the scene of the crime and the victim, and suggested a possible motive.

Defendant argues that even if relevant, the prejudicial effect of the items exceeded any probative value.

> Although relevant, evidence may be
> excluded if its probative value is
> substantially outweighed by the danger of

> unfair prejudice, confusion of the
> issues, or misleading the jury, or by
> considerations of undue delay, waste of
> time, or needless presentation of
> cumulative evidence.

Rule 403, M.R.Evid. A district court's weighing of potential prejudice against probative value will be upheld absent an abuse of discretion. State v. Austad (1982), 197 Mont. 70, 83, 641 P.2d 1373, 1380. The District Court below rejected defendant's argument that the evidence was unfairly prejudicial because it reflected on his character. This Court rejected a similar argument in State v. Armstrong (1976), 170 Mont. 256, 552 P.2d 616, where evidence of defendant's destitute financial condition, outbursts of anger, and high regard for his weapons formed circumstantial evidence from which to infer a motive for the homicide. Here, photographs of the objects formed circumstantial evidence from which to infer the defendant was the perpetrator and to infer a motive from evidence of his interest in violent sex. In a violent sex-related homicide most evidence linking the defendant to the crime is likely to be somewhat prejudicial. Here, the State used photographs of the objects having probative value rather than the objects themselves, the latter of which may have had greater potential for prejudice. We find that the District Court did not abuse its discretion by allowing these photographs into evidence.

A detective testified that the defendant gave a statement in which he denied ever dealing with prostitutes. A later witness testified that the defendant had paid for the services of two prostitutes for himself and the defendant. Another witness testified that the defendant told her he

would "get a hooker" after she refused to go home with him. The defendant argues, as part of this third issue, that this testimony was inadmissible under Rule 404(b), M.R.Evid., and that the danger of unfair prejudice outweighed any probative value of the testimony.

Rule 404(b), M.R.Evid., states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. (Emphasis added.)

In State v. Shaw (1982), 199 Mont. 248, 252, 648 P.2d 287, 289-90, this Court held that "other crimes" evidence under this Rule may be admitted to show consciousness of guilt. The testimony was offered to show that the defendant gave a false statement about his contacts with prostitutes during questioning about the homicide of a prostitute rather than to prove his character. A false explanation of incriminating information may be considered evidence of consciousness of guilt. United States v. Green (9th Cir. 1979), 597 F.2d 1227, cert. den., 444 U.S. 853. As noted above, absent an abuse of discretion, this Court will not overturn a district court's weighing of the danger of prejudice against probative value. Austad, 197 Mont. at 83, 641 P.2d at 1380. The testimony made the issue of the defendant's identity more likely by allowing an inference of his consiousness of guilt. We find no abuse of discretion in admitting this evidence.

The fourth issue concerns whether the District Court erred when it replaced a juror during trial, after finding out the juror was to be arrested for the felony offense of

20

sexual intercourse without consent. The State brought the matter to the District Court's attention at an _in camera_ hearing after it became aware of the pending investigation. The officer who was investigating the juror testified that the juror confessed to the crime, knew he would be arrested and had expressed concern that the timing of the arrest would affect his duties as a juror. The State moved to disqualify the juror for the reasons that he may be overly sympathetic to the defendant or he may vote for a conviction to gain leniency from the State. The defendant's counsel agreed that both possibilities were relevant concerns but argued that the alternate was not paying attention. He did not object to the juror's removal. The District Court then disqualified the juror and questioned him regarding whether the other jurors were aware of his situation. He testified that they were not. The District Court denied the defendant's subsequent motion for mistrial based on contamination of the jury panel and on the alternate's lack of attention. The defendant raised the juror's disqualification as an issue in his motion for a new trial, arguing that the District Court did not have the authority to remove the juror after the presentation of evidence began and that there was an insufficient showing of possible bias on the part of the juror. When denying the motion for a new trial, the District Court stated the defendant no longer claimed prejudice from the alternate's participation and the defendant had agreed there was a potential for prejudice if the juror remained on the panel. The District Court held the possibility of the juror's being charged was sufficient to prevent his impartiality in deliberations.

Contrary to the defendant's contention, the removal of this juror was not premised on § 46-16-306, MCA. The District Court considered §46-16-306 and -304(2), MCA, on challenges for cause as an aid in determining whether the possibility of the juror being charged was sufficient to replace him. The juror was replaced pursuant to § 46-16-307(3), MCA, which states:

> Alternate jurors, in the order in which they are called, shall replace jurors who, prior to the time the jury arrives at its verdict, become unable or disqualified to perform their duties
> . . .

The plain meaning of the statute is that substitution of an alternate for an original juror who becomes disqualified or unable to perform his duties is permitted at any time prior to the reaching of a verdict. Clearly, the defendant's argument that the District Court's action was not timely must fail.

Rule 24(c) of the Federal Rules of Criminal Procedure contains language similar to § 46-16-307(3), MCA. The federal circuits consistently hold that the trial court has the discretion to remove a juror and seat an alternate whenever the facts show the juror's ability to perform his duties is impaired. The circuits also consistently hold that the reviewing court will not disturb the ruling unless the defendant shows bias or prejudice. U.S. v. Ellenbogen (2nd Cir. 1966), 365 F.2d 982, 989, cert. den., 386 U.S. 923, 87 S.Ct. 982, 17 L.Ed.2d 795. See also, U.S. v. Zambito (4th Cir. 1963), 315 F.2d 266, 269, cert. den., 373 U.S. 924, 83 S.Ct. 1524, 10 L.Ed.2d 423; U.S. v. Smith (5th Cir. 1977), 550 F.2d 277, cert. den., sub. nom.; Wallace v. U.S. (1977), 434 U.S. 841, 98 S.Ct. 138, 54 L.Ed.2d 105; U.S. v. Barrett

22

(9th Cir. 1983), 703 F.2d 1076, 1083, n. 12. "'[P]rejudice' would include discharge of a juror for want of any factual support, or for a legally irrelevant reason. There must be some 'sound' basis upon which the trial judge exercised his discretion." U.S. v. Rodriguez (5th Cir. 1978), 573 F.2d 330, 332.

The District Court had a legal reason and heard facts from which it could determine the juror's ability to perform his duties would be impaired. Section 46-16-304(2)(j), MCA, provides that a challenge for cause may be taken if the juror has a "state of mind in reference . . . to either of the parties which would prevent him from acting with entire impartiality and without prejudice to the substantial rights of either party." An officer who had been or would be present during trial testified that the juror knew he was to be arrested for a sex related offense by that same officer. The defendant's counsel agreed that concerns about the juror voting either to curry favor with the State or in sympathy for the defendant were legitimate concerns. The District Court did not abuse its discretion.

The better procedure would have been to question the juror prior to replacing him with an alternate. However, in this case such a hearing would have had limited utility. The juror had a right to remain silent about the pending charges and any insistence on his part that he could remain impartial may have had little weight. The District Court already had sufficient information to remove the juror.

The defendant apparently held the view that the jury panel would be contaminated if the juror remained. The District Court questioned the juror and determined that he

had not discussed his situation with the others, including the alternate. After this, the defendant still objected only on the grounds of contamination of the jury panel. He did not object to the removal of the juror. If the District Court had let the juror remain, the defendant would be arguing that was error. We hold that the District Judge acted within her discretion when replacing the juror with the alternate. The defendant has failed to demonstrate any prejudice from the action and any procedural error was harmless.

Nor did the defendant demonstrate prejudice from the calling of the alternate juror. The alternate was subjected to voir dire and accepted by the defendant. The defendant alleged improper conduct by the alternate only in his motions for a mistrial and a new trial. The record shows no objection during trial and no request to admonish the alternate for a failure to pay attention. The District Court did not note any inappropriate behavior by the alternate.

In the final issue, the defendant argues that the State's closing argument denied him due process and a fair trial. Montana has long held that objections to closing arguments first made on appeal are too late. Hawkins v. Crist (1978), 178 Mont. 206, 583 P.2d 396, cert. den., 439 U.S. 957, 99 S.Ct. 359, 58 L.Ed.2d 350. The defendant admits he chose not to object as a matter of trial strategy. Contrary to his contentions, State v. Harris (Mont. 1984), 682 P.2d 159, 41 St.Rep. 866, does not hold that a motion for a new trial preserves an objection to a closing argument. Harris relies on the plain error doctrine in § 46-20-702,

MCA. This case does not meet the conditions set forth in that statute.

Further, the prosecutor's statements during closing argument were based on the evidence admitted at trial. There was no comment on the defendant's failure to testify or on facts not in evidence. The District Court, when presented with the motion for new trial, correctly ruled the failure to object barred consideration of this issue because substantial rights of defendant were not affected and correctly noted the comments did not exceed the bounds of permissible argument.

The jury verdict, subsequent judgment and the order denying defendant's motion for a new trial are affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices

25