36 F.3d 1095
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Angres David THORPE, Defendant-Appellant.
 No. 93-5747.
 United States Court of Appeals, Fourth Circuit.
 Argued: April 14, 1994.
Decided: September 20, 1994.
 
 Appeal from the United States District Court for the Middle District of North Carolina, at Durham. William L. Osteen, Sr., District Judge. (CR-93-35-1)
 Thomas Kieran Maher, Rulolf & Maher, P.A., Chapel Hill, North Carolina, for Appellant.
 Harry L. Hobgood, Assistant United States Attorney, Greensboro, North Carolina, for Appellee.
 Benjamin H. White, Jr., United States Attorney, Greensboro, North Carolina, for Appellee.
 M.D.N.C.
 AFFIRMED.
 Before HALL and MICHAEL, Circuit Judges, and GODBOLD, Senior Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Angres Thorpe appeals his conviction for bank robbery under 18 U.S.C. Sec. 2113(a) and the denial of his motion to suppress the fruits of a roadside detention and search of his vehicle, including statements he made during the detention. Thorpe additionally challenges a jury instruction and the district court's dismissal of a juror for cause. Finding no error, we affirm.
 
 I.
 
 2
 On January, 19, 1993, the First Citizens Bank in Durham, North Carolina, was robbed. Unfortunately, the bank's video cameras were not working that day. Before the robbery, a teller, Wanda King, noticed an African American male come into the bank's foyer and place a mask over his face; she got a "quick glance" at the robber before he put on the mask. She testified that he had a light complexion, was slightly built, and stood a bit shorter than her own height of 5 8". When the robber demanded money, she noticed that he had a speech impediment. She complied with the robber's demand, but included in the satchel (provided by the robber) some bills in a dye pack rigged to later explode, emit teargas and stain the money red. King also included a stack of $5.00 bills bound by a currency strap marked with her teller number, the date, the bank's initials (FCB), and her own handwritten initials.[1] A bank customer in the parking lot saw an African American male, whom he could not otherwise describe, run out of the bank and get into a blue Chevrolet driven by a second African American male.
 
 
 3
 About a week before the robbery, King took note of two African American males who came in the bank within a half hour of each other. Both acted suspiciously. The second man to enter was described by King as slightly built with a light complexion. When he approached King and asked for the first man, King noticed that the second man had a speech impediment. Surveillance photographs of the two men were identified by King and admitted at trial.
 
 
 4
 On January 25, 1993, six days after the bank robbery, Appellant Thorpe was driving North on Interstate 95 in Maryland when he was stopped for speeding at 5:15 p.m. by Trooper John Appleby. Thorpe, driving a rental car, produced a rental agreement in his name and a North Carolina driver's license with an address in Durham. Appleby took Thorpe's papers to run a computer check. Because Thorpe's female passenger seemed unusually nervous, Appleby decided to separate the two for his own safety; he had Thorpe sit in the patrol car during the computer check. There, Appleby asked Thorpe about their travel plans. Thorpe told Appleby that he and his passenger were going to New Jersey to visit his mother, and then on to New York City.[2] While Trooper Appleby was talking to Thorpe, the trooper noticed Thorpe's passenger repeatedly looking back at the patrol car, moving around and bending over in her seat. This led Appleby to suspect she was trying to reach for a weapon or hide drugs.
 
 
 5
 Because of the passenger's peculiarly furtive actions, I-95's reputation as a drug corridor, and their destination of New York and New Jersey, narcotics source areas, Appleby asked Thorpe (at approximately 5:40 or 5:45) if he had any weapons, illegal drugs, or other contraband in the car. Thorpe said he did not. Appleby then asked Thorpe for consent to search the car. Thorpe orally consented. Nonetheless, Appleby took fifteen minutes to go over a written consent form with Thorpe, specifically explaining to Thorpe that he could refuse the search. Thorpe signed the consent form at 6:00 p.m. Appleby then radioed another trooper for assistance.
 
 
 6
 When the second trooper arrived, Appleby searched the car. In the trunk Appleby found over $2,000 inside various containers within containers, such as in a vitamin bottle inside a shaving kit and in a plastic bag inside a plastic food container. The money was colored red, was wet, and had a pungent odor. Appleby told Thorpe that he was seizing the money found in the trunk.[3] Without giving Thorpe a Miranda[4] warning, Appleby asked him why the money smelled the way it did. Thorpe said that he had put chemicals on the money, but he did not offer an explanation as to why. Appleby presumed that the money was somehow related to drug activity.
 
 
 7
 Appleby then placed Thorpe back in the patrol car. Although it is not clear from the record, it appears that Appleby had not yet returned Thorpe's license and rental papers to him.[5] Still without giving Thorpe a Miranda warning, Appleby questioned him further about the money. Thorpe told Appleby that the money came from his savings and that he was taking it to New Jersey to give to his mother for her new home. Appleby gave Thorpe a warning citation and released him.
 
 
 8
 The money seized from Thorpe included the wrapped bundle of $5.00 bills marked with King's teller number, her initials, the date of the robbery, and the initials of the bank, FCB. At trial the red stain on seized money from Thorpe was linked to the dye pack given to the robber. This was done through FBI tests on seized bills and the testimony of the employee of the chemical company that sold the dye packs to the bank. The grainy photographs of the two men who (the week before the robbery) had previously entered the Bank and acted suspiciously were introduced. However, neither King (the teller) nor the customer who saw the robber leave the bank could identify Thorpe as one of the robbers. Nor did King identify him as one of the two suspicious men. Thorpe's statements to Trooper Appleby about the money were introduced against him as part of the government's case in chief.
 
 
 9
 Thorpe did not testify. His only witness was his son, who testified that the man in the bank photo was not Thorpe, that his father did not have a speech impediment, that his father did not own a blue car, that he had never seen Thorpe in the company of a person with a blue car, and that his father's mother lived in New Jersey.
 
 
 10
 At a pretrial hearing Thorpe moved to suppress the fruits of the search (the seized money) and the statements he had made concerning the money. The district court denied the motion, finding that the length of Thorpe's detainment was reasonable under the Fourth Amendment due to the time required to run the license check and explain the consent form. The court further ruled that the trooper had a reasonable suspicion that a weapon or contraband was in the car and was justified in requesting permission to search. Finally the court ruled that Thorpe's consent to the search was voluntary. The court, however, made no finding as to whether Thorpe was ever in custody.
 
 
 11
 After the jury was selected the court discovered that one juror, Fowler, had two previous criminal convictions. Fowler had listed those convictions (a 1990 misdemeanor drug conviction and a 1984 felony embezzlement conviction) on his questionnaire. However, through some inadvertence, the court and the parties were not apprised of Fowler's record before the voir dire. The government objected to Fowler serving, asserting that it would have struck Fowler peremptorily had it known of his record. Part of the government's concern about Fowler was based on its pending motion to introduce motive evidence about Thorpe's alleged crack cocaine habit. Thorpe had argued that the proposed evidence was inadmissible and the court had reserved decision until trial. Additionally, the district court was unsure whether Fowler's civil rights, including the right to serve as a juror, had been restored. Concluding that neither party could have made an informed decision about Fowler's service as a juror, the court removed Fowler for cause. Thorpe objected. To minimize any prejudice to Thorpe, the court offered Thorpe an additional peremptory challenge to use in selecting the replacement juror. Thorpe ultimately agreed to the replacement of Fowler by one of the alternates, but preserved his objection.
 
 
 12
 The jury convicted Thorpe, and he was sentenced to ninety-four months imprisonment. He appeals.
 
 II.
 
 13
 We first address Thorpe's claim that the district court erred in excusing a selected juror for cause. Thorpe does not claim that he received an unfair trial due to juror bias. He simply argues that he was deprived of a particular juror, Fowler. The government responds that even assuming that Fowler was legally eligible to serve, his selection prejudiced the government: Because it did not know of Fowler's record, the government was "prohibited from fully evaluating his impartiality and making an informed decision whether to exercise a peremptory challenge against him." Response Br. at 27.
 
 
 14
 A trial court has broad discretion to decide whether to remove a juror for cause and its decision should not be overturned except when manifest prejudice results. See United States v. Zambito, 315 F.2d 266, 269 (4th Cir.), cert. denied, 373 U.S. 924 (1963).
 
 
 15
 The district court said it was not sure (nor are we from this record) whether Fowler was eligible to serve. In any event, the lack of information about Fowler's convictions established a potential for prejudice to the government if Fowler were not dismissed. In addition, the court remedied any procedural injustice to Thorpe by giving him another peremptory challenge to use in choosing a replacement. On these facts, we conclude that the district court did not abuse its discretion by removing Fowler from the jury. Nor did the removal result in manifest injustice to Thorpe.
 
 III.
 
 16
 We next address Thorpe's challenge to the following jury instruction:
 
 
 17
 Possession of property recently stolen, if not satisfactorily explained, is a circumstance from which a jury may draw the inference and find in light of surrounding circumstances shown by the evidence in the case, that the person in possession not only knew the property had been stolen, but also participated in some way in the theft of the property. The term "recently" is a relative one and has no fixed meaning. Whether property may be considered as recently stolen depends on the nature of the property and all the other evidence received in the case. It is solely for you, the jury, to determine what inferences, if any, should be drawn from the evidence received in this case.
 
 JA 144-45 (emphasis added).[6]
 
 18
 At trial Thorpe objected and asked that the instruction not be given or, in the alternative, that additional language be included to state more clearly that the inference was not sufficient by itself to convict him beyond a reasonable doubt. The government conceded that the inference must be corroborated by other evidence, and the highlighted language, drawn from United States v. Johnson, 563 F.2d 936, 940 n. 2 (8th Cir.1977), cert. denied, 434 U.S. 1021 (1978), was added. Unsatisfied, Thorpe preserved his objection.
 
 
 19
 After deliberating for an hour, the jury asked the court to "[p]lease explain the sections on burden of proof and possession of stolen property." JA 150. The court directed the jury to the written instructions covering those topics. Thorpe contends that the jury's question shows that the contested instruction was both crucial to the verdict and unconstitutionally irrational. Thorpe buttresses this irrationality argument with a challenge to the sufficiency of the evidence. Thorpe's contentions are without merit.
 
 
 20
 The instruction did not compel the inference of guilt. It left the decision to the jury. It is thus a "permissive" inference as defined in Ulster County Court v. Allen, 442 U.S. 140, 157 (1979). In Allen, the Supreme Court held that the constitutionality of a permissive inference must be determined on a case-by-case basis. Id. at 163-67. If the basic fact (in this case possession of the stolen money without a satisfactory explanation) is the only evidence of the inferred fact (in this case participation in the robbery), then the inference may be upheld only if the basic fact proves the inferred fact beyond a reasonable doubt. However, if, as here, additional evidence of the defendant's guilt exists, then a rationality standard applies. Id. at 165; West v. Wright, 931 F.2d 262, 265 (4th Cir.1991), rev'd on other grounds, 112 S.Ct. 2482 (1992).
 
 
 21
 To meet the rationality standard, the inferred fact must be " 'more likely than not' " to flow from the basic fact. Allen, 442 U.S. at 166-67 & n. 28 (quoting Leary v. United States, 395 U.S. 6, 36 (1969)). History, common sense and experience are accepted guides in determining rationality. Barnes v. United States, 412 U.S. 837, 842 (1973) (citing Leary, 395 U.S. at 36); Allen, 442 U.S. at 172 (Powell, J., dissenting). History, experience, and common sense all substantiate the "rational connection" between Thorpe's possession (absent a satisfactory explanation) of the bank's recently stolen money and Thorpe's participation in the robbery.
 
 
 22
 The Fourth Circuit has long approved the use of such an inference. See, e.g., United States v. Long, 538 F.2d 580 (4th Cir.1976) (per curiam); cf. Battaglia v. United States, 205 F.2d 824 (4th Cir.1953) (approving instruction that unexplained possession of a recently stolen and transported vehicle gives rise to an inference of guilt of transporting a stolen vehicle in interstate commerce). Moreover, here the jury was comprehensively instructed as to burden of proof, reasonable doubt, and the elements of the crime, insuring that the permissive inference did not lessen the government's burden to prove every element beyond a reasonable doubt. See Cupp v. Naughten, 414 U.S. 141, 146-47 (1973) (instructions must be reviewed in the context of the overall charge); cf. Coleman v. Butler, 816 F.2d 1046, 1049 (5th Cir.1987) (jury charge as a whole would disabuse a reasonable juror of any notion that the instruction created a mandatory presumption rather than a permissive inference).
 
 
 23
 Thorpe's challenge to the constitutional sufficiency of the evidence likewise is unavailing. After reviewing the evidence in the light most favorable to the prosecution, it is clear that substantial evidence sustains the jury's verdict and that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See infra Part V (discussing facts in harmless error analysis).
 
 IV.
 
 24
 Thorpe consented (both orally and in writing) to the search of his car that led to the recovery of the stolen money. Thorpe contends, however, that Trooper Appleby both detained and questioned him in violation of his Fourth Amendment rights and therefore that the money recovered from the search should have been suppressed. Specifically, he says his consent came during an unreasonably prolonged detention and that it was the product of unreasonable questioning in the patrol car.
 
 
 25
 If during an ordinary traffic stop an officer develops a reasonable articulable suspicion of a serious crime, the officer may further detain the driver and ask questions to allay his suspicions. United States v. Jeffus, 22 F.3d 554, 557 (4th Cir.1994). Thorpe and his passenger were driving in a rental car on I-95, a known drug corridor, when Trooper Appleby pulled them over.[7] Because Appleby was concerned for his safety, he decided to separate Thorpe from his unusually nervous passenger while he (Appleby) completed a computer check. See United States v. Rusher, 966 F.2d 868, 877 (4th Cir.), cert. denied, 113 S.Ct. 351 (1992) (computer check is legitimate investigative activity during traffic stop). Appleby moved Thorpe to the patrol car, see Pennsylvania v. Mimms, 434 U.S. 106, 109-111 (1977) (per curiam) (safety concerns may justify moving investigative detainee), and, while he was conducting the computer check, Appelby asked Thorpe permissible questions about Thorpe's travel plans. See United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir.1989) (officer "could legitimately ask about ... travel plans"). Thorpe told Appelby that he was travelling to New Jersey and then to New York, narcotics source areas. See United States v. Bueno, 21 F.3d 120, 121 (6th Cir.1994) (New York "is a known source city for narcotics"). Moreover, while Appleby was talking with Thorpe, he noticed Thorpe's passenger repeatedly glancing back at the patrol car and bending over in her seat, behavior consistent with that of a person trying to reach for a weapon or hide drugs.
 
 
 26
 We conclude that under the totality of the circumstances Appleby was justified in detaining Thorpe and in requesting to search his car.
 
 
 27
 Thus, the district court did not err in denying Thorpe's motion to suppress the money recovered from the search.
 
 V.
 
 28
 Thorpe was not given a Miranda warning before he answered Trooper Appelby's questions about the source of the money and the chemical smell. Thorpe argues that the admission of his statements against him at trial constituted a Miranda violation. See Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (Miranda is triggered when roadside detention and questioning are elevated to custodial interrogation). The government argues that there was no Miranda violation because Thorpe was not subject to a custodial interrogation when he made the statements; rather, he was subject to a Terry[8] stop. We believe a legitimate question exists as to whether Appleby's routine traffic stop matured into a custodial interrogation after Appleby searched Thorpe's car and seized the money. Nevertheless, we need not decide this issue, because we conclude that the admission of Thorpe's statements against him at trial was harmless error.
 
 
 29
 The erroneous admission of a statement taken in violation of Miranda is "harmless only when the court, after assessing 'the record as a whole to determine the probable impact of the improper evidence on the jury,' can conclude beyond a reasonable doubt that the error did not influence the jury's verdict." Williams v. Zahradnick, 632 F.2d 353, 360 (4th Cir.1980) (quoting Morgan v. Hall, 569 F.2d 1161, 1166 (1st Cir.), cert. denied, 437 U.S. 910 (1978)). We review the record de novo to determine whether the government has sufficiently proved that the admission of Thorpe's statements against him did not contribute to his conviction. Arizona v. Fulminante, 499 U.S. 279, 295-96 (1991). After a careful review of the record, we conclude that Thorpe's statements did not materially affect the other evidence before the jury and that a reasonable jury would have convicted him had his statements not been admitted at trial.
 
 
 30
 The jury had before it overwhelming evidence that Thorpe robbed the bank. He was the same gender, race, weight, height, and complexion as the robber. Like the robber, he spoke with a lisp or speech impediment. He lived in the state and city where the robbery occurred. Most significant, of course, six days after the bank was robbed, Thorpe had in his possession a significant amount of the stolen money: King (the teller) was able to identify a bound stack of five dollar bills found in Thorpe's trunk because the currency strap bore the bank's initials, her teller number, her handwritten initials, and a date which was the day of the robbery; an FBI agent and a chemical company employee linked the red stain on the currency to the dye pack used by FCB; and when Appelby discovered the money, it was still wet, red, and pungent. Moreover, Appelby found the money cached away in vitamin bottles, plastic bags and food containers in Thorpe's trunk. Thorpe offered no alibi evidence. The testimony of his son, regardless of its credibility, would not raise a reasonable doubt in light of the weight of the foregoing evidence.
 
 
 31
 In short, when Thorpe's statements to Trooper Appleby are stripped away, the remaining evidence is so overwhelming that it establishes beyond a reasonable doubt that Thorpe robbed the bank. Accordingly, even if the district court erred in admitting Thorpe's statements, the error was harmless.
 
 VI.
 
 32
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 AFFIRMED
 
 
 [1]
 At the time King was too scared to realize exactly how much money she was handing over to the robber. After the robbery an inventory of her cash drawer revealed that $8,168.75 had been taken
 
 
 [2]
 Appleby testified at trial that Thorpe had a lisp or accent, but that he could understand him
 
 
 [3]
 Appleby also saw (but did not seize) two to three hundred dollars in twenties in Thorpe's wallet with red around the edges
 
 
 [4]
 Miranda v. Arizona, 384 U.S. 436 (1966)
 
 
 [5]
 Appleby testified that although he did not tell Thorpe he was under arrest, Thorpe was never free to leave. Specifically, Appleby said that if Thorpe had tried to leave, he would have stopped him
 
 
 [6]
 The court's proposed instruction (minus the highlighted language) was taken substantially from 1 Devitt and Blackmar, Federal Jury Practice and Instructions Sec. 16.10 (1992). See also id. Sec. 49.13
 
 
 [7]
 Thorpe does not challenge the validity of the stop itself
 
 
 [8]
 Terry v. Ohio, 392 U.S. 1 (1968)