[No. A097349. First Dist., Div. Five. Sept. 26, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL PATRICK HARD, Defendant and Appellant.

COUNSEL

Joseph Baxter, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Violet M. Lee and John R. Vance, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SIMONS, J.— Under Health and Safety Code section 11379.8, a defendant convicted of manufacturing methamphetamine "with respect to" a substance of a certain volume containing methamphetamine earns an enhanced penalty. In this case we consider whether a defendant arrested in the early stages of the manufacturing process is subject to this volume enhancement when he possesses more than three gallons of a solvent containing methamphetamine to be used in the final stage of the process to purify crystallized methamphetamine. Defendant argues that the volume enhancement applies only to a substance produced during the manufacture and does not apply to a substance possessed for later use in the process. We disagree and conclude that the volume enhancement applies to any substance containing methamphetamine which is produced, used, or to be used in the process of manufacturing methamphetamine.

 Health & Safety Code section 11379.8, subdivision (d) grants discretion to the sentencing court to strike the volume enhancement. Because the trial court mistakenly believed it lacked such discretion, we remand for resentencing. (*People v. Meloney* (2003) 30 Cal.4th 1145 [135 Cal.Rptr.2d 602, 70 P.3d 1023].)[1]

PROCEDURAL BACKGROUND

A jury found defendant guilty of manufacturing methamphetamine (Health & Saf. Code, § 11379.6, subd. (a)) and of doing so with respect to a substance containing methamphetamine that exceeded three gallons of liquid by volume (Health & Saf. Code, § 11379.8, subd. (a)(1)). The jury also found him guilty of possession of ephedrine with intent to manufacture methamphetamine (Health & Saf. Code, § 11383, subd. (c)), and of obstructing or

---

[1] In an opinion filed on May 27, 2003, we affirmed the judgment in this matter in its entirety. On August 27, 2003, the Supreme Court granted review and transferred the matter to us with directions to "vacate [our] decision and to reconsider the cause in light of *People v. Meloney* (2003) 30 Cal.4th 1145 [135 Cal.Rptr.2d 602, 70 P.3d 1023]." In part IV of this opinion, we apply *Meloney* and alter our prior determination.

delaying a peace officer (Pen. Code, § 148, subd. (a)). In a separate court trial, the court found true special allegations that defendant had been convicted in the past of possessing methamphetamine for sale (Health & Saf. Code, §§ 11370.2, subd. (b), 11378) and had served a prior prison term (Pen. Code, § 667.5, subd. (b)).

The court sentenced defendant to prison for the aggregate term of 14 years, comprised of the upper seven-year term for processing methamphetamine, to run consecutively with a three-year term for the volume enhancement, a three-year term for the prior conviction of possessing methamphetamine for sale, and a one-year term for having served a prior prison term. The court stayed an upper six-year term on the conviction for possession of ephedrine with intent to manufacture methamphetamine, and sentenced defendant to a concurrent one-year jail term for the misdemeanor conviction of obstruction of a police officer.

FACTUAL BACKGROUND

In the course of investigating another crime, a Lake County deputy sheriff smelled a strong odor related to methamphetamine manufacture emanating from a pickup truck located in the parking lot next to a motel in Lakeport. Later, the officer smelled the same odor coming from room 10 at the motel, situated directly across the lawn from the truck. The officer knocked on the door of room 10 and demanded entry to do a search but was refused. The officer went around to the back door of room 10 and noticed it was ajar, but when the officer started to push it open, defendant slammed the door shut. Next, the officer heard what sounded like furniture being moved against the door as though the person in the room was barricading himself inside.

After several hours of negotiations failed to persuade defendant to surrender, tear gas was used to drive him from the room. Defendant was taken into custody and the room was searched.

Keys to the truck were found in the room. From the truck, law enforcement officers seized numerous items that could be used in the manufacture of methamphetamine, including two plastic gas cans, a five-gallon white plastic bucket with a lid on it, and a red zippered bag that held three canning jars. Each contained liquid. By combining the contents of the five-gallon bucket with those of the two gas cans, the total volume amounted to at least four gallons.

From room 10, officers seized additional items that could be used in the manufacture of methamphetamine. These items included several pieces of glassware that can function as chemical reaction vessels. In addition, officers

seized a garbage bag containing a box of Red Devil lye, also used in the methamphetamine manufacturing process, and empty boxes of pseudoephedrine. Pseudoephedrine can be a source of ephedrine used in the manufacture of methamphetamine. Ephedrine was found in a round bottomed flask located in the bathroom of room 10.

Gregory Popovich, a clandestine controlled substances laboratory expert employed by the California Department of Justice, testified that he arrived at the scene soon after the arrest of defendant, examined the materials found in the truck, and entered and examined room 10. He found evidence of two different methods for manufacturing methamphetamine: the ephedrine reduction method and the phenyl-2-propanone (P-2-P) method. In the ephedrine reduction method, ephedrine is extracted from cold tablets by a multistep process that includes grinding the tablets into a fine powder to which chemicals are applied. Popovich testified that the ephedrine in the round bottomed flask represented an early stage of this process. He explained that in later steps the ephedrine is turned into crystallized methamphetamine, which is then washed with an organic solvent to further purify it. He found no completed methamphetamine in room 10, but did find chemicals consistent with manufacture employing the ephedrine reduction method.

Popovich found glassware in room 10 that he associated with the P-2-P method due to residue in the glassware. However, he did not find all of the other materials needed for production under the P-2-P method in room 10 or in the truck. The liquids found in the containers seized from the truck were organic solvents that had earlier been used to produce methamphetamine by means of the P-2-P method. The presence of methamphetamine, together with P-2-P in these liquids, suggested that these solvents were waste material from which methamphetamine had previously been extracted. In the final step of both the P-2-P and ephedrine reduction processes, an organic solvent is used to clean or purify the crystallized methamphetamine. Popovich explained that methamphetamine manufacturers tend to save and reuse such solvents because law enforcement agents look for large sales of them. He further stated that methamphetamine could be extracted from these solvents, but that they probably did not contain a "significant amount of product." Popovich could not say that the solvent taken from the truck had been produced in room 10, but stated that it had the potential to be used to further purify the methamphetamine that was in the course of production in room 10, even though the method being used in room 10 was the ephedrine reduction method. He concluded that the presence of methamphetamine in the solvent would not increase its effectiveness in the purification process.

DISCUSSION

## I. *The Jury Instruction on Volume Enhancement Was Valid*

Over defendant's objection the court modified the 1996 version of CALJIC No. 17.21,[2] the standard instruction defining the volume enhancement imposed by Health and Safety Code[3] section 11379.8, subdivision (a)(1). The key portion of the court's modified instruction read as follows: "It is alleged under count one in the first special allegation that the substance containing methamphetamine exceeded three gallons of liquid by volume within the meaning of [section] 11379.8, subdivision (a)(1). [¶] In order for you to find this special allegation to be true, the following elements must be proved: [¶] One, the person was convicted of manufacturing methamphetamine; two, one of the substances used in, to be used in or produced during the manufacturing process contained methamphetamine; and three, that substance containing methamphetamine exceeded three gallons of liquid by volume." The jury later found this volume enhancement true. This instruction permits a true finding even if the substance containing methamphetamine, the solvent in this case, had not yet been used in the manufacturing process. Defendant contends that this instruction exceeds the intended scope of section 11379.8, and that it was error to provide it. Resolution of this contention requires an analysis of the section's breadth.

In construing this statutory provision, familiar rules of statutory interpretation guide our task. "The primary duty of a court when interpreting a statute is to give effect to the intent of the Legislature, so as to effectuate the purpose of the law. [Citation.] To determine intent, courts turn first to the words themselves, giving them their ordinary and generally accepted meaning. [Citation.] If the language permits more than one reasonable interpretation, the court then looks to extrinsic aids, such as the object to be achieved and the evil to be remedied by the statute, the legislative history, public policy, and the statutory scheme of which the statute is a part. [Citation.] . . . Ultimately, the court must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and it must avoid an interpretation leading to absurd consequences. [Citation.]" (*In re Luke W.* (2001) 88 Cal.App.4th 650, 655 [105 Cal.Rptr.2d 905].)

In pertinent part, section 11379.8, subdivision (a) provides: "Any person convicted of a violation of subdivision (a) of Section 11379.6 . . . *with*

---

[2] The relevant portion of CALJIC No. 17.21 (6th ed. 1996) states: "It is alleged [in Count ____] that at the time of the commission of the crime of which the defendant is accused, [he] [she] ____ a substance containing ____ which exceeded . . . [____ by liquid volume]."

[3] All undesignated section references are to the Health and Safety Code.

*respect to* any substance containing a [statutorily specified] controlled substance . . . shall receive an additional term as follows: (1) Where the substance exceeds three gallons of liquid by volume or one pound of solid substances by weight, the person shall receive an additional term of three years." (Italics added.) Defendant would have us construe the italicized phrase narrowly so that one convicted of manufacturing methamphetamine would be liable for the enhanced penalty only if the substance containing methamphetamine was manufactured in that process. This imposes too limited a meaning for the phrase "with respect to" used by the drafters. ■ Under the term "respect," Webster's defines "with respect to" as "with reference to: in relation to." (Webster's 10th Collegiate Dict. (2000) pp. 994–995.) While the phrase certainly applies to those who manufacture a substance of sufficient volume, it is broad enough to also cover persons who used or will use such a substance in the course of producing the final product.

This broader interpretation is supported by evaluating the language of the enhancement in the context of the breadth of the underlying offense, section 11379.6 (manufacturing methamphetamine). Section 11379.6 provides, in relevant part, "[E]very person who manufactures, compounds, converts, produces, derives, processes, or prepares, either directly or indirectly by chemical extraction or independently by means of chemical synthesis, any controlled substance specified in Section . . . 11055 [(methamphetamine)], . . . shall be punished by imprisonment in the state prison. . . ." As our Supreme Court has explained, "The conduct proscribed by this section encompasses the initial and intermediate steps carried out to process a controlled substance." (*People v. Coria* (1999) 21 Cal.4th 868, 874 [89 Cal.Rptr.2d 650, 985 P.2d 970], citing *People v. Lancellotti* (1993) 19 Cal.App.4th 809, 813 [23 Cal.Rptr.2d 640].) "It is evident from the Legislature's use of such all-encompassing language that it intended to criminalize all acts which are part of the manufacturing process, whether or not those acts directly result in completion of the final product." (*People v. Heath* (1998) 66 Cal.App.4th 697, 705 [78 Cal.Rptr.2d 240].) The scope of the prohibition in section 11379.6 is broad because the production of methamphetamine is an incremental, not instantaneous process, often conducted in a piecemeal fashion to avoid detection. (*Lancellotti*, at pp. 811, 813.) Because the police can interrupt production at any stage, the language of section 11379.6 should be construed broadly to ensure that a manufacturer will not receive any benefit from police intervention early in the process.

Consequently, section 11379.6 contemplates that a conviction may result even though production is interrupted before all of the substances gathered by a manufacturer and necessary to produce a final product have been utilized. We believe that section 11379.8 should be interpreted in a similar fashion. Had the deputy sheriff arrived at room 10 while newly purified crystallized methamphetamine settled in the solvent, the volume enhancement would

clearly apply. We see no reason to interpret the enhancement narrowly to provide a benefit to a manufacturer simply because law enforcement officers arrive earlier in the process, before the solvent has been employed.

Defendant argues the methamphetamine in the solvent was chemically irrelevant to the solvent's role in the process, and, therefore, no legitimate statutory goal is served by subjecting the substance to the volume enhancement. We disagree. The Legislature stated in the uncodified portion of the statute enacting section 11379.8 that: "It is the intent of the Legislature in enacting [section 11379.8] to punish more severely those *persons who are in the regular business of trafficking in, or production of, narcotics* and those persons who deal in large quantities of narcotics as opposed to individuals who have a less serious, occasional, or relatively minor role in this activity." (Stats. 1985, ch. 1398, § 1, p. 4948, italics added.) We believe the intent expressed in this italicized phrase is furthered by interpreting section 11379.8 to authorize the challenged instruction. The solvent contained methamphetamine because it had been utilized in the past to produce that controlled substance. Punishing a current manufacturer who intends to reuse a solvent more severely than one who will use a clean solvent is consistent with the legislative goal of punishing repeat manufacturers. Thus, the instruction given by the trial court in this case was correct.

## II. *Section 11379.8 Is Not Unconstitutionally Vague*

Defendant contends that if the trial court were correct in applying the volume enhancement to the facts in this case, then the section, as applied, would be void for vagueness. He argues that the language of section 11379.8 fails to provide adequate notice that "the volume enhancement applies to supplies prior to their use in the chemical production process." He claims that section 11379.8, by its terms, "only appears to apply to chemicals produced in the manufacturing process."

The Attorney General argues this contention is waived because defendant did not raise it below. Some Courts of Appeal have extended the doctrine of waiver to constitutional issues, including vagueness or overbreadth. (See *People v. Gardineer* (2000) 79 Cal.App.4th 148, 151–152 [93 Cal.Rptr.2d 863]; *In re Josue S.* (1999) 72 Cal.App.4th 168, 170–174 [84 Cal.Rptr.2d 796].) However, the Court of Appeal in *In re Justin S.* (2001) 93 Cal.App.4th 811, 814–815 [113 Cal.Rptr.2d 466], held that a constitutional vagueness or overbreadth challenge is not waived where the challenge presents a pure question of law that can be resolved without reference to the record. Assuming without deciding that the waiver rule is inapplicable, we find defendant's claim without merit.

In *People v. Rubalcava* (2000) 23 Cal.4th 322 [96 Cal.Rptr.2d 735, 1 P.3d 52], the court set forth the parameters of the vagueness doctrine: "A law is void for vagueness only if it 'fails to provide adequate notice to those who must observe its strictures' and ' "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." ' [Citations.]" (*Id.* at p. 332.) "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." (*Lanzetta v. New Jersey* (1939) 306 U.S. 451, 453 [83 L.Ed. 888, 890, 59 S.Ct. 618]; accord, *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1115 [60 Cal.Rptr.2d 277, 929 P.2d 596].)

In order for a criminal statute to satisfy the dictates of due process, it must meet two requirements. "First, the provision must be definite enough to provide a standard of conduct for those whose activities are proscribed. [Citations.] Because we assume that individuals are free to choose between lawful and unlawful conduct, 'we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he [or she] may act accordingly. Vague laws trap the innocent by not providing fair warning.' [Citations.] [¶] Second, the statute must provide definite guidelines for the police in order to prevent arbitrary and discriminatory enforcement. [Citations.]" (*People v. Heitzman* (1994) 9 Cal.4th 189, 199–200 [37 Cal.Rptr.2d 236, 886 P.2d 1229].)

In analyzing whether a statute is sufficiently definite to pass constitutional muster, we look not only at the language of the statute but also to legislative history and California decisions construing the statute. (*Pryor v. Municipal Court* (1979) 25 Cal.3d 238, 246 [158 Cal.Rptr. 330, 599 P.2d 636].) This is because the courts require citizens to apprise themselves not only of statutory language, but also of legislative history and subsequent judicial construction. (*People v. Heitzman, supra,* 9 Cal.4th at p. 200; see also *People v. Falck* (1997) 52 Cal.App.4th 287, 293–295 [60 Cal.Rptr.2d 624].) In addition, our Supreme Court has cautioned that "abstract legal commands must be applied in a specific *context.* A contextual application of otherwise unqualified legal language may supply the clue to a law's meaning, giving facially standardless language a constitutionally sufficient concreteness. Indeed, in evaluating challenges based on claims of vagueness, the [United States Supreme Court] has said '[t]he particular context is all important.' " (*People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th at p. 1116, quoting *American Communications Assn. v. Douds* (1950) 339 U.S. 382, 412 [94 L.Ed. 925, 951, 70 S.Ct. 674].)

"All presumptions and intendments favor the validity of a statute and mere doubt does not afford sufficient reason for a judicial declaration of invalidity.

Statutes must be upheld unless their unconstitutionality clearly, positively and unmistakably appears. [Citations.]" (*Lockheed Aircraft Corp. v. Superior Court* (1946) 28 Cal.2d 481, 484 [171 P.2d 21].) A statute "cannot be held void for uncertainty if any reasonable and practical construction can be given to its language." (*Ibid.*)

Defendant's vagueness challenge is unpersuasive. As we have already discussed, the wording of section 11379.8 does not limit the volume enhancement to only those substances that are *manufactured* during a violation of subdivision (a) of section 11379.6. The plain language of section 11379.8 applies, without any limitation, to persons convicted of section 11379.6 "with respect to any substance containing a [statutorily specified] controlled substance . . . : [¶] (1) Where the substance exceeds three gallons of liquid by volume." (§ 11379.8, subd. (a)(1).) Furthermore, the statement of statutory intent for section 11379.8 makes explicit that this section was intended to cover persons, like defendant, who engage in large scale *or* repeated production of prohibited substances. (Stats. 1985, ch. 1398, § 1, p. 4948.) Finally, the cases interpreting the laws prohibiting the manufacture of methamphetamine have held that it applies to each step in the manufacturing process, regardless of whether a defendant has completed production at the time the operation is halted. ■ Thus, section 11379.8, viewed in the appropriate context, places persons on notice that *all* substances containing methamphetamine, used or to be used in an operation prohibited by section 11379.6, are subject to the volume enhancements specified in section 11379.8. Persons who conduct such an operation and utilize or produce large volumes of substances containing a controlled substance have fair warning that doing so will subject them to longer terms of imprisonment than those who "have a less serious, occasional or relatively minor role." (Stats. 1985, ch. 1398, § 1, p. 4948.)

### III. *Substantial Evidence Supports the Jury's Finding on Volume Enhancement*

■ Defendant contends that there was insufficient evidence to support the true finding on the volume enhancement. In determining whether a criminal conviction lacks sufficient evidentiary support, we must review the whole record in the light most favorable to the judgment below to determine whether it discloses "substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].)

■ In this case, it was undisputed that the solvents seized from the truck contained methamphetamine and amounted to more than three gallons by volume. The criminalist testified that such solvents are often reused by

methamphetamine manufacturers in the final stages of production to further purify the methamphetamine being produced. He further testified that the solvents from the truck were suitable to be used to purify the particular methamphetamine that had been under production in room 10, even though the ephedrine reduction method was being employed. In other words, the mere fact that these specific solvents had been used in the past to purify methamphetamine made with the P-2-P method, and could be considered a waste product of that process, did not preclude them from being reused to purify the contraband under production inside room 10. These facts are substantial evidence from which the jury could determine that, but for the interruption by law enforcement, the solvents in the truck were to be used by defendant in a later stage of the methamphetamine manufacture underway in room 10.

## IV. *Sentencing Error Requires Remand For Resentencing*

Section 11379.8, subdivision (d) expressly provides: "Notwithstanding any other provision of law, the court may strike the additional punishment for the enhancements provided in this section if it determines that there are circumstances in mitigation of the additional punishment and states on the record its reasons for striking the additional punishment." Defendant correctly contends the trial court mistakenly believed it lacked this discretion in its sentencing of defendant. Hence, we remand the case to permit the trial court to determine whether or not to exercise this discretion. (See *People v. Meloney, supra,* 30 Cal.4th at pp. 1151, 1165.)

At the sentencing hearing, the trial court provided an extended explanation of its intended sentencing decisions before allowing counsel to argue and before pronouncing judgment and sentence. The court recognized that it had to decide whether to stay the sentence for count two under Penal Code section 654. Further, the court noted that it had discretion to select the lower, middle, or upper term on the conviction for count one. However, as to the three enhancements for count one (prior prison term, three-gallon volume enhancement, past conviction of possessing methamphetamine for sale), the court stated in the clearest language possible that it had no discretion and must increase the prison term selected by seven years.[4] Under section 11379.8, subdivision (d), this conclusion was erroneous. Defendant had a right to have the court exercise the discretion it possessed prior to imposing

---

[4] The court's pertinent comments were: "There are three enhancements that were found to be true by the jury. One is a prior prison term, another is the three-gallon measurement and another is a combination of a current conviction with a prior conviction. That is a conviction for count one with a prior conviction of possession for sale, [section] 11378, which you have. That's a three-year enhancement. [¶] So there's seven years worth of enhancements. All of them are mandatory consecutive. Okay. So whatever prison term I select has to be increased by seven years. There is no if's, and's or but's. Again, my hands are basically tied."

sentence on the enhancement. We remand to permit this to occur. (*People v. Meloney, supra,* 30 Cal.4th at p. 1165.)

### DISPOSITION

The judgment is reversed and remanded to the trial court for a new sentencing hearing, at which the trial court shall exercise its discretion under section 11379.8, subdivision (d) in deciding whether to strike the three-year enhancement provided by that section.

Jones, P. J., and Stevens, J., concurred.