IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 385

STATE OF MONTANA,

        Plaintiff and Respondent,

    v.                                Cause No. 03-136

JOHN EDWARD GRAHAM,

        Defendant and Appellant.

STATE OF MONTANA,

        Plaintiff and Respondent,

    v.                                Cause No. 03-163

SHAWNON LANETTE JARVIS,

        Defendant and Appellant,

APPEAL FROM:    District Court of the Nineteenth Judicial District,
                      In and for the County of Lincoln, Cause No. DC 2002-55
                      The Honorable Michael C. Prezeau, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                Amy N. Guth, Attorney at Law, Libby, Montana

        For Respondent:

                Honorable Mike McGrath, Montana Attorney General, C. Mark Fowler,
                Assistant Attorney General, Helena, Montana; Bernard Cassidy, Lincoln
                County Attorney, Robert Slomski, Deputy County Attorney, Libby Montana

Submitted on Briefs:  August 21, 2003

Decided:  December 28, 2004

Filed:

_____
                            Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 John Edward Graham pled guilty to one count of Operation of Unlawful Clandestine Laboratory, a felony, in violation of § 45-9-132, MCA, while reserving his right to appeal from the Order of the District Court denying his Motion to Suppress Evidence. By an Order Consolidating Appeals issued by this Court on July 8, 2003, without objection by the State or by Graham, we consolidated the appeal of Shawnon Lanette Jarvis, Cause No. 03-163, a co-tenant of the residence occupied by Graham, pursuant to Rule 4(b), M.R.App.P., as these cases were likewise consolidated in the District Court on the Motion to Suppress. The facts and legal arguments raised below, and the Order of the District Court appealed herein, are identical. We reverse.

## ISSUES

¶2 Did the District Court err when it denied Graham's Motion to Suppress Evidence and concluded that:

¶3 1. the search warrant application contained sufficient probable cause to justify a search of Graham's residence;

¶4 2. the search warrant application and the search warrant were not overly broad; and

¶5 3. the search warrant application was properly signed under oath?

¶6 Because Issue One is dispositive, we do not reach the remaining issues.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶7 On July 11, 2002, Daniel Lawson was arrested in Lincoln County on a charge related to the manufacture of methamphetamine. Lawson confessed and offered to provide information about other clandestine methamphetamine laboratories operating in the Libby area. The information provided by Lawson led to the execution of a search warrant on Graham's home and property.

¶8 The search warrant application was signed by Detective Klint Gassett of the Lincoln County Sheriff's Office on July 12, 2002, and signed by Lincoln County Justice of the Peace Marlene Herried the following day. The application recites that Gassett had probable cause to believe that an unlawful clandestine laboratory was operating on the premises of the "John Doe Residence" at 3890 South Highway #2 in Libby. Gassett alleged that the property contained items related to a clandestine laboratory and enunciated a list of items to search for that would be considered "contraband, evidence, fruits of the crime, and articles and instrumentalities used in the commission of the crime. . . ." Gassett further states, "[t]hat the facts which are the grounds of this application and upon which applicant relies to establish probable cause for the issuance of a Search Warrant are outlined in the attached Exhibit 'A', incorporated by this reference herein."

¶9 Exhibit A explains that, after confessing to operating a methamphetamine laboratory, Lawson provided information to the arresting officers about other Lincoln County residents who were allegedly manufacturing methamphetamine. It further states that information provided by Lawson about several individuals was corroborated by independent evidence

3

and reports. Exhibit A includes Lawson's physical description of Graham and the other

residents of that household, whose names Lawson did not know. Further specifics Lawson

provided about Graham as memorialized by Gassett in Exhibit A are as follows:

> Lawson stated [John Doe] has a methamphetamines laboratory in his garage. [A woman and a child] reside in the house with [Doe]. They live in a one story white house with a fence. Their vehicles appear to be a Dodge Dart, maroon or red in color and a Silver 79 to 81 Oldsmobile. The home is next to HW#2 . . . across the highway from Pioneer Auto Wrecking. There is an unattached garage next to the home and that is where the methamphetamine laboratory is located.
>
> Lawson said that he has been to the home approximately 10 times, the last time being the day before this interview. Lawson said that he takes out Joe Dubler to the residence and that Joe Dubler cooks methamphetamines for [Doe]. That Dubler has told him this and that when he picks up Dubler from the residence he sometimes get[s] methamphetamines from Dubler. . . . Dubler admitted to this affiant that he has been around methamphetamine laboratories. Dubler denies knowing how to cook. Dubler has a prior record for drug related crimes.
>
> Lawson told this affiant that Chris Stone told him he taught [Doe] to cook methamphetamines and that the methamphetamine laboratory was in the garage of DOE. . . .
>
> Lawson told your affiant that . . . Stone has been in the garage and does cook methamphetamines with DOE. Lawson stated to your affiant that he has dropped Dubler off at the residence and . . . Dubler go[es] into the garage with DOE. Lawson stated that when he has picked up Dubler from that location that Dubler has brought out methamphetamines to his vehicle from the garage. Lawson stated that Dublers [*sic*] and Stone told him recently that the Methamphetamine Laboratory at the DOE residence/garage is still operational.
>
> On July 11, 2002, Lawson showed your affiant where the . . . residence/garage was located. The home is as described by Lawson, except that there is light green trim on the one story home. [On] July 12, 2002, your affiant got close enough to see the license plate on a gray or silver 4-door vehicle parked in front [of] the house . . . registered to a Shawnon Jarvis. . . . An owner

4

registration check shows that Jarvis also owns a 1994 Saturn 2Door Maroon in color. . . .

The address taken from the Saturn 2-Door registration check is the same address that Lawson showed your affiant where the DOE residence was located. . . .

On July 11, 2002 your affiant saw Joe Dublers mother's vehicle at [this residence]. Your affiant has seen Joe Dubler drive this vehicle before.

With all the information provided your affiant believes that there is a Clandestine Methamphetamine Laboratory at the JOHN DOE residence located at 3890 S HW #2, Libby, Mt. Lawsons previous information has turned out to be true and correct and there is no known reason why the information regarding this methamphetamine laboratory should be any different.

¶10 After the search warrant was signed on July 13, the home and property of "John Doe"--who turned out to be John Graham--was subsequently searched. No evidence of a methamphetamine laboratory was found in the garage, but evidence was located and seized elsewhere on the property. After Graham's arrest, he moved to suppress the evidence gained in the search of his residence. The District Court denied the Motion. Pursuant to a plea agreement, Graham pled guilty to Operation of Unlawful Clandestine Laboratory, a felony, in violation of § 45-9-132, MCA, and reserved his right to appeal the denial of the pretrial Motion to Suppress.

**STANDARD OF REVIEW**

¶11 We review a district court's denial of a motion to suppress to determine whether the court's findings of fact are clearly erroneous and whether the court's interpretation and application of the law is correct. *State v. Marks*, 2002 MT 255, ¶ 10, 312 Mont. 169, ¶ 10,

5

59 P.3d 369, ¶ 10 (citations omitted). We review a district court's legal conclusion on whether or not a search warrant is overbroad *de novo*. *State v. Seader*, 1999 MT 290, ¶ 4, 297 Mont. 60, ¶ 4, 990 P.2d 180, ¶ 4 (citation omitted).

## DISCUSSION

¶12 Did the District Court err when it denied Graham's Motion to Suppress Evidence and concluded that the search warrant application contained sufficient probable cause to justify a search of Graham's residence?

¶13 Graham argues that the District Court erred when it concluded that Detective Gassett's search warrant application contained sufficient probable cause to justify a search of his residence. He argues that the application contained only information identifying Graham's *garage* as a location in which a clandestine methamphetamine laboratory operated. While he concedes that the search warrant application established probable cause to search his garage, Graham claims the application recited no information upon which the judge could form any belief that a crime was being committed in the residence, or elsewhere on the property. He claims that, in light of the information provided in the application, the issuing court exceeded the scope of a permissible warrant by including his residence, curtilage, outbuildings and vehicles in the warrant. Graham states, "It is not a logical assumption that if the informant is reliable or that the information provided by the informant is corroborated, that the State may search *any* real or personal property connected with the person informed upon." (Emphasis in original.)

6

¶14 The State responds that the search warrant application enunciated a substantial number of facts establishing probable cause that criminal activity had occurred in the residence and was not confined to the garage. The State points to specific facts in the warrant, and asserts that, "a reasonable inference supports the determination that the kinds of ingredients and equipment used to manufacture methamphetamine would be found in the home where a suspect resides next to an unattached garage." The State claims that it is a reasonable inference that the circumstances set forth in Gassett's application would lead a magistrate to conclude that many of the easily portable common household items, such as cold tablets, matches, and cookware, would move back and forth between the house and the unattached garage. The State, citing *State v. Sundberg* (1988), 235 Mont. 115, 119, 765 P.2d 736, 739, argues that the totality of the circumstances set forth in the four corners of the application, evaluated in a practical and commonsense manner, established a fair probability that incriminating items reasonably connected with criminal behavior would be located inside the house.

¶15 Pursuant to § 46-5-101(1), MCA, a search of a place may be made and evidence may be seized by the authority of a valid search warrant. A warrant is valid if the application made in support thereof states facts sufficient to show probable cause in accordance with the requirements of § 46-5-221, MCA. *Marks*, ¶ 14. Section 46-5-221, MCA, provides:

> **Grounds for search warrant.** A judge shall issue a search warrant to a person upon application, in writing or by telephone, made under oath or affirmation, that:

7

(1) states facts sufficient to support probable cause to believe that an offense has been committed;

(2) states facts sufficient to support probable cause to believe that evidence, contraband, or persons connected with the offense may be found;

(3) particularly describes the place, object, or persons to be searched; and

(4) particularly describes who or what is to be seized.

¶16   In its Order Denying Defendant's Motion to Suppress Evidence, the District Court found that, while Lawson personally observed activity which circumstantially implicated Graham, he did not have direct personal observation of criminal activity by Graham.  Thus, the District Court concluded, independent corroboration that suspicious activity was taking place at the location specified by Lawson would be required.  (See *State v. Reesman*, 2000 MT 243, ¶¶ 29-30, 301 Mont. 408, ¶¶ 29-30, 10 P.3d 83, ¶¶ 29-30.)  The District Court further found that this independent corroboration had been satisfied, noting,

> The subsequent police investigation verified a number of innocent details – that the house was similar to the way it was described by Lawson, that Graham had a gray Oldsmobile, that Graham's girlfriend was approximately the height and weight described by Lawson – but it also established that a car registered to Joe Dubler's mother and known to be driven by Joe Dubler, a known drug user – according to his prior criminal record and his own admission – was parked at Graham's residence on July 11, 2002, the day before the search warrant application was prepared.  With that piece of police work, Lawson's information was adequately corroborated.

Thus, the District Court concluded, the totality of circumstances recited in the search warrant application established probable cause to believe that the crime of manufacturing methamphetamine was being committed on Graham's property and that evidence of the crime would be found there.

8

¶17    While we agree that the information supplied by Lawson was corroborated by the appearance of the Graham residence and the presence there of an automobile used by Dubler, such corroborating information does not--without more--supply probable cause to search the residence. The command to search can never include more than is covered by the showing of probable cause to search. *United States v. Hinton* (7th Cir. 1955), 219 F.2d 324. In the case at hand, the search warrant application clearly stated that Lawson averred that Graham had a methamphetamine laboratory in his garage; that the unattached garage was where the methamphetamine laboratory was located; and that the methamphetamine was brought by Dubler from the garage to Lawson's vehicle. *See ¶ 9, above.* The showing of probable cause does not extend to the house. The particular place to be searched, as evidenced by the application and circumscribed by § 46-5-221(3), MCA, was clearly the "garage."

¶18    The Dissent argues that methamphetamine laboratories are, by their very nature, portable entities. While this may be true, there were no allegations in this search warrant application that the lab or its parts had been or were being transported. Although the affidavit states that Graham was using his garage for the manufacture of methamphetamine, the affidavit *does not* state that Graham was engaged in the sale of methamphetamine or that Graham personally transported the methamphetamine from place to place, as the Dissent asserts. The only accusation of methamphetamine transport in the application was as to Dubler, and not as to Graham. Had there been allegations in the application of items being transported back and forth by Graham, we would have no problem upholding the search of Graham's home. If the government demands to search a person's home, then it must have

9

probable cause and a warrant; without both, the search is *per se* unreasonable. This is the "indelible rule." While there are a few "specifically established" and "well-delineated" exceptions to the warrant requirement, a "meth lab" exception is not one of them. We therefore reject the State's contention that because the easily portable items associated with methamphetamine laboratories, such as cold tablets, matches and cookware, *could* "move back and forth" between the house and the unattached garage, the search of the residence was justified.

¶19 We have long recognized the sanctity of the home and the need for particularity in granting search warrant applications. *State ex rel. Samlin v. District Court* (1921), 59 Mont. 600, 609-10, 198 P. 362, 365 (complaining party must have reasonable cause to suspect that criminal instrumentalities are concealed within the specified house). We have held that an arrest warrant for a person does not permit officers to enter the home of a third party without a search warrant. *State v. Kao* (1985), 215 Mont. 277, 283-84, 697 P.2d 903, 908 (regardless of how reasonable an officer's belief may have been that an escaped felon was hiding in the home of a third party, the belief was not subjected to the detached scrutiny of a judge and the resident's only protection against an illegal entry was the officer's personal determination of probable cause).

¶20 Homes have special protection in search and seizure law. In *State v. Therriault*, 2000 MT 286, ¶ 53, 302 Mont. 189, ¶ 53, 14 P.3d 444, ¶ 53, we articulated this principle, as follows:

In analyzing the officer's entrance of the home, however, we restate[] the indelible rule that warrantless searches conducted inside a home are per se unreasonable, "subject only to a few specifically established and well-delineated exceptions." [*State v. Hubbel* (1997), 286 Mont. 200, 212, 951 P.2d 971, 978.] This Court has routinely stated that the physical invasion of the home is the chief evil to which the 4th Amendment and Montana's Article II, § 11, are directed. We have emphasized again and again that the entrance to the home is where the federal and Montana constitutions draw a firm line, and that absent an exception, that threshold may not be crossed without a warrant. See, e.g., *State v. Kao* (1985), 215 Mont. 277, 282-83, 697 P.2d 903, 907 (quoting *Payton v. New York* (1980), 445 U.S. 573, 100 S. Ct. 1371, 63 L.Ed.2d 639); *State v. Bassett*, 1999 MT 109, ¶ 25, 294 Mont. 327, ¶ 25, 982 P.2d 410, ¶ 25.

*Therriault* at ¶ 53. We recently reaffirmed this principle in *State v. Stone*, 2004 MT 151, ¶ 40, 321 Mont. 489, ¶ 40, 92 P.3d 1178, ¶ 40.

¶21 In somewhat different language, we also stated this principle in *State v. McLees*, 2000 MT 6, ¶ 25, 298 Mont. 15, ¶ 25, 994 P.2d 683, ¶ 25:

'At the risk of belaboring the obvious, private residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by warrant, and that expectation is plainly one that society is prepared to recognize as justifiable.' *State v. Scheetz*, 286 Mont. 41, 48-49, 950 P.2d 722, 726. 'The fundamental purpose of the Fourth Amendment's prohibition against unreasonable searches and seizures is to protect the privacy and security of individuals and safeguard the sanctity of the home against arbitrary invasions by governmental officials.' *Dorwart v. Caraway*, 1998 MT 191, ¶ 21, 290 Mont. 196, ¶ 21, 966 P.2d 1121, ¶ 21 [(overruled on other grounds)].

¶22 Although the right to be free from unreasonable searches and seizures encompasses more than the home, the home, nonetheless, is historically the *raison d'être* for the constitutional protection. The people's protection against unreasonable search and seizure in their "houses" was drawn from the English common-law maxim "A man's home is *his*

castle." *Minnesota v. Carter* (1998), 525 U.S. 83, 94 (Scalia, J., concurring) (emphasis in original).  "[E]very man's house is looked upon by the law to be his castle."  3 W. Blackstone, Commentaries on the Laws of England 288 (1768).  The home is the most sanctified of all "particular places."  If the State is to enter a person's home through the use of a search warrant, it must show probable cause that contraband or evidence will be found in the home.  It is not sufficient to show that evidence may be found in an unattached outbuilding and thus, through "reasonable inference" may also be found in the home itself.  The United States Supreme Court has recognized this, albeit in *dicta*:

> When an official search is properly authorized – whether by consent or by the issuance of a valid warrant – the scope of the search is limited by the terms of the authorization.  *Consent to search a garage would not implicitly authorize a search of an adjoining house*; a warrant to search for a stolen refrigerator would not authorize the opening of desk drawers.  Because "indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment," *Payton v. New York*, 445 U.S. 575, 583, that Amendment requires that the scope of every authorized search be particularly described.

*Walter v. United States* (1980), 447 U.S. 649, 656-57 (emphasis added).  If authorization to search a garage does not implicitly authorize a search of an adjoining house, it would surely not encompass an unattached house, which is the situation in the case before us.

¶23    Curiously, the Dissent complains that our decision here today means, "that from now on, in Montana, a home can no longer be the subject of a search warrant unless there is probable cause that relates *directly* to the home. . . ."  *See Dissent, ¶* 31 (emphasis in original).  Indeed.  This is neither a new or disturbing holding--it has long been the case that, without probable cause, law enforcement officers may not search a person's home.  Like it

12

or not, that is the law under both the federal and Montana Constitutions. Under both the Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution, people are explicitly guaranteed the right to be free from unreasonable searches and seizures in their houses and homes.

¶24 As noted above, the mere portability of items commonly used in a methamphetamine laboratory does not justify the search of otherwise unimplicated structures. This is especially true when the unimplicated structure is a person's home. See *State v. Kaluza* (1993), 262 Mont. 360, 362, 865 P.2d 263, 264 (probable cause to search one residence of defendant does not automatically grant sufficient probable cause to search a second residence owned by defendant). See also *State v. Meyer*, 2004 MT 272, ¶ 23, 323 Mont. 173, ¶ 23, 99 P.3d 185, ¶ 23 (probable cause to search residence exists where search warrant application avers that informant specifically observed delivery of contraband directly to suspect's residence). Were we to adopt the Dissent's position, any home near a structure rightly subject to a search warrant would be considered fair game, on the sole basis of its proximity and the possible portability of the contraband. Such an expansive interpretation would wholly negate the need to establish by application that it is probable to believe that the items to be discovered are located *in the home, as the particular place to be searched*. We decline to eviscerate the requirement that when a person's residence is to be searched, the application must demonstrate the probability that the items to be seized will be found within it.

¶25 The warrant requirement is the mechanism implementing the constitutional protection against the "chief evil" of the government physically invading the privacy and sanctity of

13

a person's home. It is the requirement which prevents precisely the sort of fishing expedition for evidence based on speculation and suspicion that the Dissent appears to find acceptable. Indeed, long ago we specifically condemned this practice. *State ex rel. Thibodeau v. District Court* (1924), 70 Mont. 202, 209, 224 P. 866, 869 ("the search and seizure statutes are not intended to permit fishing expeditions into the homes of citizens on the possibility that evidence of crime may be disclosed").

¶26 Moreover, this bedrock principle cannot be overcome by resorting solely to "common sense," "practical considerations," and "probability." Facts stated in the application are also statutorily and constitutionally required before the magistrate is entitled to use these other intuitive approaches in making the totality of circumstances determination. *State v. Kuneff,* 1998 MT 287, ¶ 22, 291 Mont. 474, ¶ 22, 970 P.2d 556, ¶ 22; Section 46-5-221, MCA. Here, there were no facts included in the application for search warrant that implicated Graham's home. Common sense, practical considerations and probabilities are not, therefore, enough.

¶27 Rather, if the authorities had probable cause to search Graham's home, then they were required under well-settled principles of search and seizure law to include facts supporting that conclusion within the four corners of the search warrant application and to ensure that the home was particularly designated as a place to be searched in the warrant. See *State v. Meyer*, 2004 MT 272, ¶¶ 21, 23, 323 Mont. 173, ¶¶ 21, 23, 99 P.3d 185, ¶¶ 21, 23; Section 46-4-221, MCA; 4th Amend. U.S. Const.; Mont. Const. Article II, Section 11. Because the search warrant application contained no information supporting probable cause

14

to search any building but the garage located on the Graham property, we conclude the District Court erred in failing to suppress the evidence seized from Graham's house. It is therefore unnecessary to reach the remaining issues raised by Graham.

## CONCLUSION

¶28    For the foregoing reasons, we reverse the decision of the District Court denying the Motions to suppress filed by Graham and Jarvis and remand for further proceedings consistent with this Opinion.

/S/ PATRICIA O. COTTER


We Concur:


/S/ KARLA M. GRAY

/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ JIM REGNIER

Justice John Warner dissents.

¶29    I dissent.  This decision will fragment our jurisprudence defining probable cause sufficient to support a search warrant.  I would apply the same rules for issuing a search warrant for a residence as I would apply to one's person, one's medical records, one's automobile, and yes, to one's garage.   I would also apply, contrary to what the Court does here, the totality of circumstances test, and common sense.

¶30    Although I emphatically agree with the Court that probable cause to search a detached garage does not *automatically* translate into probable cause to search a person's residence on the same property, the warrant was proper as to both structures in this instance.  A warrant may issue covering two separate structures based upon information regarding only one structure where, like here, there is a showing that the separate structures are related to each other or used in connection with each other in some material way.  *See Steele v. United States* (1925), 267 U.S. 498, 503, 45 S.Ct. 414, 416, 69 L.Ed.2d 757.

¶31    The Court states: "the mere portability of items commonly used in a methamphetamine laboratory does not justify the search of otherwise unimplicated structures."  ¶ 24.  This statement blithely disregards the probability that methamphetamine itself would be found where the defendant was.  I also find particularly troublesome the Court's implication that from now on, in Montana, a home can no longer be the subject of a search warrant unless there is probable cause that relates *directly* to the home, no matter what the totality of circumstances, or common sense, indicate.  These statements disregard

16

our existing jurisprudence defining the permissible breadth of a search warrant, abrogate the common sense and totality of the circumstances approach to the breadth of search warrants, and make law enforcement's job infinitely more difficult.

¶32   "In dealing with probable cause . . . as the very name implies, we deal with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  *State v. Rinehart* (1993)*,* 262 Mont. 204, 210, 864 P.2d 1219, 1222-23; *State v. Kelly* (1983), 205 Mont. 417, 439, 668 P.2d 1032, 1044.  We have long held that search warrant applicants need only establish the probability of criminal activity, not a prima facie showing of criminal activity.  *State v. Crain* (1986), 223 Mont. 167, 169, 725 P.2d 209, 210.

¶33   A search will be upheld if "the nexus between the items to be seized and the place to be searched rested not on direct observation . . . but on the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide [the contraband]."  *State v. Pease* (1986), 222 Mont. 455, 465, 724 P.2d 153, 159 *quoting United States v. Spearman* (9th Cir. 1976), 532 F.2d 132.

¶34   In *Pease,* the defendant attempted to suppress evidence seized from his home and his vehicle arguing that probable cause did not exist to search those locations.  *Pease,* 222 Mont. at 464-65, 724 P.2d at 159.  Law enforcement had found the body of a homicide victim outside defendant's workplace and evidence indicating that the location of the crime was

17

defendant's workplace. Officers were seeking additional evidence including: the murder weapon, possible souvenirs taken by the perpetrator, and personal effects of the victim – items likely to be kept at the residence of the person or persons involved. In addition, law enforcement was seeking a number of other items related to the crime, individually innocuous, that were likely to be present in a vehicle or residence. *Pease,* 222 Mont. at 466, 724 P.2d at 159-60. In *Pease,* although the evidence indicated that the crime was committed in the defendant's workplace, because of the nature of the crime we held that probable cause existed to believe evidence would also be present in the defendant's vehicle and his residence.

¶35    Similarly, the affidavit in this case indicated that the manufacture of methamphetamine was taking place in the garage located next to the house. This should not preclude a finding of probable cause that evidence of the criminal activity would also be found in the defendant's residence. Although the informant's observations indicated the manufacturing was in the garage, the affidavit also stated that the informant had observed the transfer of methamphetamine from Graham's garage to the informant's vehicle. The informant reported taking a person named John to the *residence*, and that John cooks methamphetamine for Graham. Further, the informant reported that when he picks John up from the residence, the informant would sometimes get methamphetamine from him. This, under our law, constitutes a sale. Section 45-9-101, MCA. The informant also told law enforcement that yet another person, Chris, taught Graham how to "cook methamphetamine"

and would "get methamphetamines [sic] from [Graham]." Chris, the informant told the police, cooks methamphetamine for different people and also shows them how to cook. The officer seeking the warrant reported that based on his experience "drug traffickers/manufactures often have other people transport precursors or other items on a regular basis to keep the process on-going and to divert attention from themselves."

¶36 Based upon this evidence of distribution, as well as the officer's knowledge and experience, a logical nexus existed between the manufacturing site and the residence next to it, where the defendant lived. An issuing magistrate, using a common sense approach, and considering the totality of the circumstances, could easily find that the facts lead to a natural inference that contraband would likely be found in the house especially considering the items sought by law enforcement. *See Pease*, 222 Mont. at 465, 724 P.2d at 159.

¶37 We, like other courts, have recognized that drug trade is a very mobile and portable criminal undertaking. *See State v. Byers,* 2003 MT 83, ¶ 8, 315 Mont. 89, ¶ 8, 67 P.3d 880, ¶ 8 (portable methamphetamine lab found in duffle bag); *State v. Galpin,* 2003 MT 324, 318 Mont. 318, 80 P.3d 1207 (officer's knowledge that chemicals used to manufacture methamphetamine are easily mobile, highly toxic, and even explosive justified precautionary search of defendant's duffle bag incident to arrest); *State v. Miles* (Kan. 1983), 662 P.2d 1227, 1237 (recognizing "[a]s modern American society becomes increasingly mobile, drugs clandestinely manufactured . . . are easily transported"); *People v. Smith* (Ct. App. 1980), 166 Cal.Rptr. 778, 785 (Zenovich, J., dissenting) (discussing issue of staleness in regards to drugs which are easily transportable, consumed, or hidden).

¶38 Law enforcement is also familiar with methamphetamine manufacturers' efforts to avoid detection, including the production of the drug in a piecemeal fashion. *People v. Hard* (Ct. App. 2003), 5 Cal.Rptr.3d 107, 112 ("[t]he production of methamphetamine is an incremental, not instantaneous process, often conducted in a piecemeal fashion to avoid detection").

¶39 This knowledge and common sense strengthen the likelihood that evidence of drug manufacturing would be found in the manufacturer's home as well as his garage. The officer seeking the warrant stated that based on his experience as a Peace Officer in Montana for 22 years, 16 of which he was specifically assigned to investigate and enforce the Dangerous Drug Laws of Montana, manufacturers commonly use illicit drugs themselves and therefore are likely to keep instruments of inhalation or other preferred use apparatus around.

¶40 Here, the Court requires more than this probability of criminal activity in the home, and seemingly imposes a direct observation standard for probable cause to attach to the home. *Contra State v. Pease*, 222 Mont. at 465, 724 P.2d at 159.

¶41 I do not harbor the opinion that there should be any type of "meth lab exception" to the constitution and the statutes. I am of the opinion that, in determining whether there is sufficient probable cause to search a residence, the totality of circumstances should be considered, which includes the use and nature of the items sought, as well as the nexus between separate structures. And, I also think that common sense should not be thrown out the garage window.

¶42   I would conclude the District Court's decision, that the magistrate made a practical, common sense determination there was a fair probability that contraband or evidence of a crime would be found in the residence, is correct.

¶43   I dissent.

/S/ JOHN WARNER

Justice Jim Rice joins in the foregoing dissent.

/S/ JIM RICE